# EXHIBIT 1

**August 9, 2023 Deposition**
**Nicholas Sintos**
**Plaintiff**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS SINTOS, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | No. 21 C 5327 |
| CITY OF CHICAGO, | ) | |
| Defendant. | ) | |

The deposition of NICHOLAS SINTOS, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Raelene Stamm, a Certified Shorthand Reporter licensed by the State of Illinois, at 515 North State Street, Suite 2400, Chicago, Illinois, on the 9th day of August, 2023, at the hour of 9:00 a.m.

Reported by: RAELENE STAMM, CSR
License No.: 084-004445

APPEARANCES:

WILLENSON LAW, LLC
BY: MS. MARNI WILLENSON
3420 West Armitage Avenue
Suite 200
Chicago, Illinois 60647
marni@willensonlaw.com
On behalf of the Plaintiff;

LANER MUCHIN, LTD.
BY: MS. HEATHER BECKER
515 North State Street
Suite 2400
Chicago, Illinois 60654
(312) 467-9800
hbecker@lanermuchin.com
On behalf of the Defendant.

ALSO PRESENT:
MR. MIKE DEMARINO
MS. ABBEY HANSON



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| NICHOLAS SINTOS | |
| By Ms. Becker | 5 |
| By Ms. Willenson | 151 |
| By Ms. Becker (Further) | 154 |




E X H I B I T S


| NUMBER | IDENTIFICATION |
|---|---|
| Sintos Deposition | |
| No. 1 | 12 |
| No. 2 | 21 |
| No. 3 | 26 |
| No. 4 | 28 |
| No. 5 | 31 |
| No. 6 | 33 |
| No. 7 | 47 |
| No. 8 | 52 |
| No. 9 | 71 |
| No. 10 | 86 |
| No. 11 | 116 |
| No. 12 | 116 |




(WHEREUPON, the witness was duly sworn.)

NICHOLAS SINTOS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. BECKER:

**Q. This is the deposition of Nicholas Sintos taken pursuant to the Federal Rules of Civil Procedure.**
**Mr. Sintos, could you please state and spell your name for the record?**
A. Sure. Nicholas, N-I-C-H-O-L-A-S, Sintos, S-I-N-T-O-S.
**Q. Have you ever been a witness in a deposition before?**
A. No.
**Q. Have you ever provided testimony in any type of proceeding before?**
A. No.
**Q. So because this is a new process for you, I just want to go over a few of the ground rules as to how we're going to proceed this morning.**
A. Okay.

**Q. I'm here to ask you some questions to find out what you know about the facts that give rise to the lawsuit that you filed against the City of Chicago.**
**Because the deposition's being taken down by our court reporter, it's important that we not speak over one another. She can only take down one of us at a time.**
A. Okay.
**Q. So I'll just ask that you wait to answer a question until I've finished asking the question.**
**And, likewise, I will try to not move on until the next question until you've given a complete answer.**
A. Okay.
**Q. You must respond verbally. The court reporter can't take down head nods or uh-huhs or uh-uhs things like that, okay?**
**If you don't hear a question, just ask me to repeat it or rephrase it.**
**If you don't understand a question, again, ask me to repeat it or rephrase it.**
**And if you answer a question, I'll assume you heard it, you understand it, and you've given a complete answer; is that fair?**



A. That's fair.
**Q. Okay. Do you understand the instructions I've given you?**
A. I do.
**Q. Have you taken any medication or substance that would affect your ability to give truthful and complete answers to the questions I ask you today?**
A. I have not.
**Q. And do you have any medical or psychological condition that would affect your ability to give truthful and complete answers to the questions I ask today?**
A. No.
**Q. Any reason at all why you don't believe you'd be able to tell the truth or provide complete answers today?**
A. I will tell the truth.
**Q. Okay. What city do you presently live in?**
A. Chicago.
**Q. How long have you lived in Chicago?**
A. All my life. I was born here. Other than going away to school for four years, but yeah.
**Q. What neighborhood do you live in?**



A. I currently live in Mount Greenwood.
(Reporter clarification.)
BY MS. BECKER:
**Q. That's on the south side of the city, right?**
A. Yeah, far south side.
**Q. Okay. Do you live alone?**
A. No.
**Q. Who do you live?**
A. I live with my girlfriend.
**Q. What's your girlfriend's name?**
A. Becca.
**Q. Is that short for Rebecca?**
A. That is short for Rebecca.
**Q. And what is Rebecca's last name?**
A. Allpow, A-L-L-P-O-W.
**Q. Do you live with anyone else other than Rebecca?**
A. No.
**Q. How long have you lived with Rebecca?**
A. It's been about a year and a half, two years.
**Q. Does Rebecca work outside the home?**
A. Yes, part of the week.



**Q. Where does she work?**
A. She works for Kemper Insurance.
**Q. And what does she do for Kemper Insurance?**
A. She works in corporate philanthropy.
**Q. Okay. Are you married?**
A. No.
**Q. Have you ever been married?**
A. No.
**Q. Do you have any children?**
A. No.
**Q. What did you do to prepare for today's deposition?**
A. Well, I did meet with my lawyer twice over -- remotely. And I had a small breakfast.
**Q. Okay. Anything else?**
A. That's it.
**Q. Did you talk to anyone other than your lawyer in preparation for today's deposition?**
A. No.
**Q. Okay. Did you review any documents in preparation for today's deposition?**
A. Yes.
**Q. What did you review?**
A. The paperwork that we filed here.

**Q. Do you know specifically what paperwork?**
A. There was the interrogatories. There was the third amended thing that we submitted. Sorry, I don't remember the names specifically.
**Q. Okay. Anything else you recall?**
A. That's all I can recall right now.
**Q. You said you met with your lawyer twice, correct?**
A. In preparation for this.
**Q. In preparation for today's deposition?**
A. Yes.
**Q. Okay. And both of those were remote like over Zoom?**
A. [Nodding].
**Q. Is that a --**
A. Yes, sorry.
**Q. That's okay.**
**When was the first time you met with your lawyer over Zoom to prepare for today's deposition?**
A. About a little over a month ago. This was rescheduled, so . . .
**Q. Okay. When was the second time you met with your lawyer in preparation for today's deposition?**



A. Yesterday.
**Q. The first time you met with your lawyer to prepare for today's deposition, did anybody else participate in that meeting?**
A. No.
**Q. Okay. How long did the meeting last?**
A. About two hours.
**Q. Okay. The second time you met with your lawyer in preparation for today's deposition, was anyone else present during that meeting other than you and your lawyer?**
A. I believe Abbey was on the call.
**Q. And when you say Abbey, you're referring to Abbey Hanson?**
A. Yes, I'm referring to Abbey Hanson.
**Q. Anyone else?**
A. No.
**Q. And how long did that meeting last?**
A. A little under an hour.
**Q. Do you recall doing anything else in preparation for today's deposition?**
A. I do not recall.
**Q. Where did you attend high school?**
A. I went to St. Rita in Chicago.



**Q. Did you graduate from high school?**
A. Yes.
**Q. What year?**
A. 2005.
MS. BECKER: Let's mark this document as Plaintiff's Deposition Exhibit 1.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 1 was marked for identification.)
BY MS. BECKER:
**Q. Okay. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 1. It's a two-page document that has numbers at the bottom that say Sintos 00022 and then 23.**
**Do you recognize this document?**
A. Sorry, no. I believe this is the resume I submitted when applying for the fire department.
**Q. Okay. I'd like to direct your attention to the education section which is the second section at the top. It lists you as going to Northern Illinois University.**
**Is that the extent of your college education?**
A. Yes.



**Q. Okay. What year did you start attending Northern Illinois University?**
A. 2005.
**Q. Were you part time or full time?**
A. Full time.
**Q. Okay. And then you graduated in May of 2009?**
A. Yes.
**Q. Okay. Other than what's listed here under education in Exhibit 1, have you attended any other colleges or universities?**
A. No.
**Q. Taken any other college level coursework?**
A. No.
**Q. Do you currently hold any professional licenses or certificates?**
A. Yes.
**Q. What licenses or certificates do you hold?**
A. I am a Certified Professional Coder.
**Q. And what was the process that you had to go through to become a Certified Professional Coder, if any?**
A. I took an exam.
**Q. Okay. When did you take that exam?**

14

A. I don't remember exactly.
**Q. Do you have an approximation?**
A. 2013.
**Q. Okay. And does that certification as a professional coder, is that something that expires or now that you're certified you're forever certified?**
A. It does expire. I have to complete CEUs and pay a fee.
**Q. What are CEUs?**
A. Continued education units, I think.
**Q. Okay. Do you know when your certificate expires?**
A. It's every other October.
**Q. Okay. And do you hold any other professional licenses or certificates?**
A. No.
**Q. Have you ever held any other professional licenses or certificates?**
A. No.
**Q. How about your substitute teaching license with the Illinois State Board of Education?**
A. I don't recall there being a license.
**Q. Okay. But you did substitute teach**

15

**starting in 2010, correct?**
A. Yes.
**Q. And for how long did you substitute teach?**
A. It was less -- it was about a semester.
**Q. Okay. Was that the only time you've ever substitute taught?**
A. Yes.
**Q. Have you ever been in the military?**
A. No.
**Q. Have you furthered your formal education in any other way other than what we've just discussed?**
A. No.
**Q. Okay. Let's turn back to Plaintiff's Deposition Exhibit 1. I'd like to draw your attention to the experience section which I think chronologically starts on Page 2 and then goes up through Page 1.**
**Beginning on July of 2005 up through September of 2010, is this an accurate description of your employment background?**
MS. WILLENSON: Object to the form.
You can answer.
THE WITNESS: Yes, for what is pertinent at the

16

time.
BY MS. BECKER:
**Q. Were there any jobs that you worked in from July of 2005 to September of 2010 that you chose not to list on this resume?**
A. I don't remember.
**Q. I noticed that there is a gap from when you graduated from college in May of 2009 to March of 2010 when you became a substitute teacher.**
**Did you have any employment during that time?**
A. I worked as a temp occasionally.
**Q. Was there an agency that you worked for as a temp?**
A. Yes.
**Q. Do you recall the name of that agency?**
A. I believe it was Mack and Associates.
**Q. For what period of time were you a temp with Mack and Associates?**
A. I was a temp until August 2010.
**Q. And what type of temp work did you do when Mack and Associates would place you as a temp?**
A. You know how they have those Chicago parking meters, I had to -- the year that they were

17

installing them, I had to stand by it all day and teach people how to use it.
**Q. Any other temp jobs that you recall from Mack and Associates?**
A. Yes.
**Q. What else?**
A. I worked in a hotel as an elevator operator.
**Q. Okay. Anything else?**
A. That's all I can think of.
**Q. All right. Let's talk about your employment with Home Physicians. You have listed on your resume that you worked there beginning in August of 2002 and -- or, I'm sorry, 2010. And it says to the present.**
**Do you still work at Home Physicians?**
A. I still work for the same company. However, they changed the name.
**Q. Okay. What is the name now?**
A. Alegis Care.
**Q. How do you spell Alegis?**
A. A-L-E-G-I-S.
**Q. Do you know when they changed their name?**
A. I don't remember.

**Q. Do you have an approximation?**
A. No.
**Q. Okay. Have there been any breaks in your employment with Home Physicians and/or Alegis since August of 2010?**
A. No.
**Q. When you started at Home Physicians slash Alegis, you were a medical biller, correct?**
A. Correct.
**Q. What were your duties as a medical biller?**
A. A lot of data entry.
**Q. Has your job title remained the same throughout your employment?**
A. No.
**Q. Okay. When did your job title change from medical biller to something else?**
A. Probably just after I submitted this I became a medical coder.
**Q. So sometime around --**
A. 2014.
**Q. -- 2018 -- 2014?**
A. Yes.
**Q. Okay. And what was the job title you moved into?**



A. Medical coder.
**Q. Was that a promotion?**
A. No.
**Q. What were your duties as a medical coder?**
A. I review doctor exams, and I attach a code to each diagnosis.
**Q. Is that your still your job title?**
A. Yes.
**Q. Okay. Other than the duties you've described as a medical biller and then medical coder, have you performed any other duties in this job that you've had for now?**
MS. WILLENSON: Object to the form.
Go ahead.
MS. BECKER: I wasn't done with the question.
MS. WILLENSON: I'm sorry.
BY MS. BECKER:
**Q. Have you had any other duties other than what you've described in your job for Home Physicians?**
A. Nothing really.
**Q. Okay. Have you been employed anywhere else since 2010?**
A. No.



**Q. Do you work for DoorDash?**
A. I did one day.
**Q. Oh, okay. And what year was that in?**
A. I don't remember.
**Q. Does 2019 ring a bell?**
A. Does the year 2019 ring a bell?
**Q. No.**
**Does it refresh your recollection if I said that somewhere in this documentation you applied to DoorDash in 2019?**
MS. WILLENSON: Objection, foundation.
Go ahead.
THE WITNESS: Yes.
BY MS. BECKER:
**Q. Okay. All right. Why did you only work at DoorDash one day?**
A. My car broke down.
**Q. Okay. Have we covered your employment background since college?**
**Everything we've talked about over the past 10, 15 minutes, does that summarize your employment background?**
A. As far as I recall.
**Q. Okay. All right. Let's talk about your**



**application with the Chicago Fire Department.**
**How did you hear about the opportunity to work for the fire department?**
A. Word of mouth.
**Q. Do you recall from whom?**
A. I live in a neighborhood that is full of firefighters and police officers. So everybody around there who is in the -- that community just talks about it.
**Q. Have you ever seen a job description for the firefighter-EMT position?**
A. Yes.
MS. BECKER: Okay. Let me show you what we'll mark as Plaintiff's Deposition Exhibit 2.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 2 was marked for identification.)
BY MS. BECKER:
**Q. Mr. Sintos, I've handed you what's a three-page document which is Bates-labeled at the bottom Sintos Def 530 through 532.**
**Do you recognize this document?**
A. I've seen a job description back in 2014, but I can't confirm if this is exactly it.

**Q. Okay. That's fair.**
**Does this appear to be a description of the position that you applied for for firefighter-EMT?**
MS. WILLENSON: Object to foundation.
THE WITNESS: Only because you're telling me it is.
BY MS. BECKER:
**Q. Okay.**
A. But I can't confirm.
**Q. Why did you want to be a firefighter?**
A. The benefits, the salary, the hours. I like the idea of the camaraderie. And I felt that it was a position that I could do some good in and in turn feel very good about myself.
**Q. When you say benefits and salary, are you -- what do you mean by that?**
**Like do you mean you can make more money than you're making as a medical coder or something else?**
A. Can you rephrase the question? It seemed like two questions.
**Q. Sure.**
**When you said you wanted to be a**



**firefighter for the benefits and salary, what do you mean by benefits and salary?**
A. Money -- the money that they'd pay me.
**Q. Okay. Would you have been making more money as a firefighter than you're currently making as a medical coder?**
A. Yes.
**Q. When you say hours, what are you referring to?**
A. The 24 on, 48 off.
**Q. That schedule is appealing to you?**
A. Yes.
**Q. Firefighters are considered first responders, right?**
A. I believe so.
**Q. Okay. What does that mean to you to be a first responder?**
A. I think the idea of being first on the scene, there's a -- there's a feeling of the idea that I can help people and do some good in the city.
**Q. Okay. When you say first on the scene, you'd be responding to fires, right?**
MS. WILLENSON: Object to foundation and form.



BY MS. BECKER:
**Q. Is it your understanding as a firefighter that you'd be responding to fires?**
A. Partly, yes.
**Q. Okay. Other types of emergencies, right?**
A. Yes.
**Q. And that may be sometimes dangerous situations?**
MS. WILLENSON: Object to the form.
THE WITNESS: Maybe sometimes dangerous situations, yes.
BY MS. BECKER:
**Q. Okay. Ans sometimes life-or-death situations?**
MS. WILLENSON: Object to the form.
THE WITNESS: Sometimes.
BY MS. BECKER:
**Q. Would you agree with me that from what you know about being a firefighter that at times it can be a stressful job?**
MS. WILLENSON: Object to the form.
THE WITNESS: I don't know. I've never been a firefighter.



BY MS. BECKER:
**Q. Okay. Do you still want to be a firefighter?**
A. Yes.
**Q. Do you want to be a firefighter more than a full-time musician?**
A. Yes.
**Q. In 2014 you submitted your application for the firefighter-EMT position, correct?**
A. Correct.
**Q. Do you recall what month? What time of year you submitted your application?**
A. I don't recall.
**Q. And you took a written exam?**
A. Yes.
**Q. And did you pass that written exam?**
A. Yes.
**Q. And then was it your understanding the passage of that written exam placed you on an eligibility list?**
A. Yes.
MS. BECKER: Let's mark the next document as Plaintiff's Deposition Exhibit 3.

(WHEREUPON, Plaintiff's Deposition Exhibit No. 3 was marked for identification.)

BY MS. BECKER:

**Q. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 3. It's a three-page document Bates-labeled Sintos 12 through 14.**

**Do you recognize this document?**

A. Yes.

**Q. What is it?**

A. An exam date notification.

**Q. Okay. Is this the exam date notification that you received notifying you of when you'd be taking your firefighter's exam?**

A. Yes.

**Q. Okay. The date -- dates it has on here for the exam is December 13 and December 14 of 2014.**

**To your knowledge, are those the dates when you, in fact, took the firefighter's exam?**

MS. WILLENSON: Object to the form.

THE WITNESS: I don't recall the exact date.



BY MS. BECKER:

**Q. Was it approximately that time frame -- within that time frame?**

A. I don't recall exactly.

**Q. What happened next after taking the exam?**

**Were you notified that you were put on the eligibility list?**

A. Yes, I was notified.

**Q. How were you notified?**

A. I think the mail.

**Q. And then what happened next with respect to the application process?**

A. Once I -- once I ended up on the eligibility list, I waited until I was called to the next portion, which was submitting all of the documents that they asked for and be coming in person and doing a drug test.

**Q. When is it that you --**

**(Reporter clarification.)**

BY MS. BECKER:

**Q. When is it that you were called in for the next portion?**

A. I'm sorry. I can't remember off the top of my head.



**Q. Do you have a year?**

A. 2016, 2017.

MS. BECKER: I'll hand you what we'll mark Plaintiff's Deposition Exhibit 4.

(WHEREUPON, Plaintiff's Deposition Exhibit No. 4 was marked for identification.)

BY MS. BECKER:

**Q. Mr. Sintos, you've been handed what's been marked Plaintiff's Deposition Exhibit 4. It's a three-page document Bates-labeled Sintos Def 223 through 225.**

**Do you recognize this document?**

A. Yes.

**Q. What is it?**

A. This is a -- this was my notice to submit documents.

**Q. Is this --**

A. And to -- sorry.

**Q. No. Go ahead.**

A. And to report to the fire academy.

**Q. Is this the notice you received to come in for further processing?**

A. Yes.



**Q. And it says here in the middle of the page after Dear Nicholas Sintos, in order to continue processing for the position of probationary firefighter-EMT, you are to report to the Fire Academy South, 1338 South Clinton, on Wednesday, August 22, 2018, at 8:00 a.m.**

**Did I read that correctly?**

A. Yes.

**Q. And did you report for further processing on that date and time?**

A. This was considered initial processing.

**Q. Did you report on that date and time for initial processing?**

A. Yes.

**Q. What do you recall about that day?**

A. I recall coming in and doing a drug test.

**Q. Okay. Anything else?**

A. That's all I can recall at the moment.

**Q. Do you recall who at the fire department or human resources you interacted with that day?**

A. No.

**Q. Okay. Anything stand out to you as unusual or maybe not going the way it should have that day?**

MS. WILLENSON: Objection to the form.
Go ahead.
THE WITNESS: Can you repeat the question?
MS. BECKER: Sure.
BY MS. BECKER:
**Q. Do you recall anything unusual or not following the normal process that day?**
MS. WILLENSON: Object to the form.
THE WITNESS: I don't recall anything unusual. Or the second thing you said, I don't understand.
BY MS. BECKER:
**Q. Okay. That's fair.**
**So you took a drug test that day?**
A. Hair and urine, yes.
**Q. Okay. Anything else you recall about that day?**
A. Handing in these documents.
**Q. These documents meaning the documents listed on Exhibit 4 as Number 1 through 14?**
A. Correct.
**Q. Anything else?**
A. No.
**Q. What was the next step in the application process?**



A. The next step I believe was coming back to Fire Academy South and signing up to do medical.
**Q. Okay. Do you know when you signed up -- when you came back to Fire Academy South to sign up for medical?**
A. I don't remember, but I'm sure you have a form saying that date.
MS. BECKER: You would think so. I don't know.
Let's mark the next document as Plaintiff's Deposition Exhibit 5.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 5 was marked for identification.)
BY MS. BECKER:
**Q. So, Mr. Sintos, you understood that in addition to passing the drug test that you just referenced on the initial processing day, that you needed to go through a medical clearance process; is that right?**
A. Yes.
**Q. I've handed you what's been marked Plaintiff's Deposition Exhibit Number 5 which is a one-page document Bates-labeled 227 at the bottom.**
**Do you recognize this document?**



A. Yes.
**Q. What is it?**
A. Confirmation of medical meeting.
**Q. And the document under Dear Mr. Sintos indicates in order to continue processing for the position of candidate firefighter-EMT, you are required to appear at the Chicago Fire Department Human Resources Office at 1338 South Clinton, Room 300, on Thursday, December 13, 2018, at -- or date, at 10:00 a.m., time, to schedule a medical examination.**
**Did I read that correctly?**
A. I think so. You kind of stuttered a bit.
**Q. I did because it was awkwardly worded.**
**But did you appear on December 13, 2018, at 10:00 a.m. for -- to schedule a medical examination?**
A. No. This is after I had signed up for the date.
**Q. Okay.**
A. Because I signed up for it at the academy, and this is where I met to actually do the medical exam.
**Q. Okay. So sometime before December 13 you**



**signed up for a date?**
A. Wait, wait, wait. I'm sorry. I spoke incorrectly.
This was when I scheduled the exam.
**Q. Okay. That was December 13, 2018?**
A. Yes.
**Q. Did you do anything else that day other than schedule the exam?**
A. Not that I recall.
**Q. Okay. At some point were you provided paperwork to fill out your medical history?**
A. I can't recall.
**Q. Okay. Did you -- well, let me just ask you.**
MS. BECKER: Let's mark the next document Plaintiff's Deposition Exhibit 6.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 6 was marked for identification.)
BY MS. BECKER:
**Q. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 6. It's a packet Bates-labeled Sintos 188 through 200.**
**Do you recognize these forms?**

A. Yes.
**Q. What are they?**
A. This is my medical history form that I filled out on December 21, 2018.
**Q. Were you provided these forms by the fire department?**
A. Yes.
**Q. And were you instructed to fill out these forms and provide your medical history?**
MS. WILLENSON: Object to the form.
THE WITNESS: Can you repeat the question?
MS. BECKER: Sure.
BY MS. BECKER:
**Q. Were you instructed to fill out these forms to provide your medical history?**
A. As far as I remember, yes.
**Q. And was it your understanding that filling out these forms was part of the medical clearance process?**
A. Yes.
**Q. And I believe you indicated you filled out these forms on December 21 of 2018; is that correct?**
A. That's what the date is on this.



**Q. Okay. And that's your signature next to that date?**
A. Yes.
**Q. And do you have any reason to dispute that that's the date you filled out these forms and signed the form?**
A. I don't think so, no.
**Q. Okay. Where were you when you filled out these forms?**
A. I don't remember the exact address.
**Q. But you were somewhere -- one of the fire department facilities?**
A. I don't think it was a fire department facility. It was a off-site building.
**Q. Okay.**
A. May I?
**Q. Yeah.**
A. If I remember, it was something called Censure or -- that's the best I can give you.
**Q. Concentra?**
A. Maybe.
**Q. Possibly?**
**It's part of the medical clearance process, though, correct?**



A. Correct.
**Q. All right. Let's look at the form just so we can confirm we've got everything here.**
**On the first page I think you already indicated that that's your signature at the bottom and the date of December 21, 2018, correct?**
A. Correct.
**Q. Is all the other handwriting on this page your handwriting? Just on Page 1.**
A. Yes.
**Q. Turning to Page 2, is that again your signature at the bottom of Page 2?**
A. That is my signature.
**Q. And does all of the handwriting on Page 2 appear to be your handwriting?**
A. Yes.
**Q. And the question -- the second question under the yes and nos, you were asked do you currently have any mental health conditions.**
**And you had reported depression and anxiety, correct?**
A. That is what the second question says, yes.
**Q. And that's your handwriting, depression**



**and anxiety?**
A. Yes, that is my handwriting.
**Q. Okay. And as part of your response to the next question you had indicated that you were seeing a psychiatrist, Vanessa Cutler, correct?**
A. Which question are you referring to?
**Q. The third question.**
A. Sorry, they're not numbered, so it's hard to --
**Q. I know.**
MS. WILLENSON: Object to foundation.
THE WITNESS: Can you repeat the question?
MS. BECKER: Sure.
BY MS. BECKER:
**Q. In response to the third question, do you have a personal doctor, you had written a name of someone as your PCP; but then you also had written the name of your psychiatrist, correct?**
A. Correct.
**Q. Page 4, if you turn there, 190?**
MS. WILLENSON: Four is 191.
MS. BECKER: Sorry, Page 3 then.
BY MS. BECKER:
**Q. Looking at Page 3, does that appear to be**

**all of your handwriting?**
A. Yes.
**Q. And for the question under disability, it's the fifth question down, it asks are you currently disabled.**
**You checked the box no, correct?**
A. I'm sorry. Can you repeat this?
**Q. Sure. There's a category on the third page for disability.**
**Do you see that?**
A. Yes.
**Q. And the fifth question down asks are you currently disabled.**
**And you checked, I believe, the box no; is that correct?**
A. I checked no at the time, correct.
**Q. Okay. Is that because you believed you were not disabled at the time?**
A. That is because I was not entirely sure what the definition of disabled was.
**Q. All right. Page 4, is this all of your handwriting on Page 4 of Exhibit 6?**
A. Yes.
**Q. Okay. When it asks you about medications,**



**you reported being on various antidepressants over the last five years, correct?**
A. Yes.
**Q. Okay. And then in the next question when it asks to explain your medications, you reported that you were taking two medications, one for depression and one for anxiety, correct?**
A. Correct.
**Q. And you also reported at the bottom of Page 4, when it asked about hospitalizations, that you had attempted suicide in 2014, correct?**
A. Correct.
**Q. And that resulted in inpatient care at Rush for five days?**
A. Is that a question?
**Q. Yeah, it is a question.**
**That's what you reported, correct?**
A. Correct.
**Q. Page 5 -- Page 5 consists of asking about, you know, various conditions and having you check the boxes yes or no.**
**Do these appear to be -- does this appear to be only your handwriting on this page?**
A. Yes.



**Q. Page 6, same thing.**
**Is this your handwriting on Page 6?**
A. Yes.
**Q. Page 7, same question.**
**I just want to confirm that you filled out the form, and this is your handwriting?**
A. This is my handwriting.
**Q. Okay. Page 8, is this your handwriting on Page 8?**
A. Yes.
**Q. Page 9, your handwriting on Page 9?**
A. Yes.
**Q. And you reported that you've been suffering from depression since 2013, correct?**
A. Yes.
**Q. Okay. Page 10, is this your handwriting on Page 10?**
A. Yes.
**Q. And you reported again the suicide attempt in 2014, correct? On Page 10?**
A. On 197 where it says suicide attempt, I checked the left box and wrote 2014.
**Q. Okay. And then thoughts of suicide, you reported not since 2014, correct?**



A. At 198, thoughts of suicide, I also checked the left box and wrote not since 2014.
**Q. Okay. Page 11, the bottom of Page 11 has a line for medical provider's signature and then medical provider name. And it's also dated December 21 of 2018.**
**That's not your handwriting, is it?**
A. No.
**Q. Everything above that, is that your handwriting?**
A. Not everything above this.
**Q. Okay. What is not your handwriting?**
A. The last two lines where it says list of medication, I don't believe that this is my handwriting.
**Q. Okay. The paragraph above it that starts with I have been treated for depression and anxiety through self harm, is that your handwriting?**
A. Can you repeat this?
**Q. Sure. That paragraph when it asks for a explanation, where it's written I have been treated for depression and anxiety, those lines going through the end that says I no longer have thoughts of self harm, is that all your handwriting?**

A. Yes.
**Q. Okay. And do you recall seeing this medical provider, Candice -- Candice A. on December 21, 2018?**
A. I do not recall.
**Q. Okay. Do you recall who you submitted this form to?**
A. No.
**Q. But did you, in fact, submit it as part of the medical clearance process?**
A. Yes.
**Q. And on Page 12 it asks for your signature in a couple places.**
**Is that your signature in two places on Page 12?**
A. This is my signature.
**Q. Same for Page 13, is that your signature?**
A. Yes.
**Q. Do you recall having a medical examination at Concentra as part of the medical clearance process?**
A. I recall this, yes.
**Q. What do you recall about that examination?**
A. I recall doing a hearing test. I recall



there was a -- an exam on a treadmill.
That's all I can recall at the moment.
**Q. About how long were you there?**
A. I don't recall.
**Q. After that exam what happened next with respect to the medical clearance process?**
A. Some point later -- I don't remember how much time had passed. I was told to meet with Dr. Wong.
**Q. When you say Dr. Wong, is that Dr. William Wong?**
A. Yes.
**Q. And was it your understanding that he was the medical director for the fire department?**
A. Yes.
**Q. Okay. And did you, in fact, meet with Dr. Wong?**
A. Yes.
**Q. Was that -- do you know how long after your exam with Concentra that it was that you met with Dr. Wong?**
A. Not exactly.
**Q. Does January 25, 2019, sound right?**
A. Oh, you already knew. Yes.



**Q. Okay. Was that the first time you had ever met Dr. Wong?**
**Did you know him previously?**
A. I did not know him.
**Q. Was that the first time you had ever communicated with Dr. Wong?**
A. In person, yes.
**Q. Okay. What do you recall about that meeting with him?**
MS. WILLENSON: Object to the form.
Go ahead.
THE WITNESS: I recall I was given instructions to -- this was considered a medical follow-up. And I remember I had to -- I was given some forms to bring to various doctors to sign and bring back to him.
BY MS. BECKER:
**Q. Okay. Anything else?**
A. There was a small chat, but I don't -- I don't remember what was discussed.
**Q. Was anyone else -- did you meet with Dr. Wong in an exam room?**
A. I don't recall.
**Q. Do you recall anyone else being present**



**when you met with Dr. Wong?**
A. I don't recall.
**Q. Do you recall how long the meeting with Dr. Wong lasted?**
A. No.
**Q. And did he, in fact, provide you forms that you were to take and have filled out by someone else?**
A. Yes.
**Q. During that meeting, did Dr. Wong say or do anything that you found to be offensive?**
A. I don't recall.
**Q. Did he say or do anything that you thought to be unprofessional?**
A. I don't recall.
**Q. Did he say or do anything you thought to be discriminatory?**
A. I don't recall.
**Q. On that day that you met with Dr. Wong for the first time, did you interact with other employees at the facility?**
A. I had to sign in, if that counts.
**Q. If you signed in, you may have interacted with a receptionist or someone there?**

A. Correct.
**Q. Okay. Anyone else?**
A. Not that I can remember.
**Q. Do you recall the names of anyone you interacted with?**
A. No.
**Q. Okay. Did anyone you interacted with or encountered say or do anything that you found to be offensive?**
A. I can't recall.
**Q. Did anyone you interacted with at that appointment say or do anything you found to be unprofessional?**
A. I can't recall.
**Q. Did anyone you encountered at the day of that appointment do or say anything you found to be discriminatory?**
A. I don't remember.
MS. BECKER: I'll show you what we'll mark as Plaintiff's Deposition Exhibit 7.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 7 was marked for identification.)



BY MS. BECKER:
**Q. Okay. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 7. It's a multipage document Bates-labeled Sintos 24 through 34.**
**I just want you to look through this packet, and then once you've had a chance to look through it, let me know if you recognize these documents.**
A. This looks familiar.
**Q. Okay. And does this look to be the packet that Dr. Wong provided you on January 25, 2019?**
A. Yes. And he wrote my name incorrectly.
**Q. So on the first page you're referring to where it says Nicholas Santos.**
**That's not your handwriting, right?**
A. That is not my handwriting.
**Q. And you believe that to be Dr. Wong's handwriting, correct?**
A. Only for the fact that he signed this document.
**Q. Sure. Okay.**
**So this is the letter he provided you, and what did you do with this packet once Dr. Wong**



**provided it to you?**
A. I brought this to my psychiatrist at the time.
**Q. Dr. Cutler?**
A. Yes.
**Q. Okay. And did you ask Dr. Cutler to complete the forms that are at Sintos 32 through 34?**
A. Yes. I asked her that.
**Q. And to your knowledge, is this -- did she fill out these three pages?**
A. Yes.
**Q. And did she --**
A. To my knowledge.
**Q. Did she provide them back to you or did she send them directly to the fire department?**
**Do you know?**
MS. WILLENSON: Object to the form.
MS. BECKER: I'll withdraw the question.
BY MS. BECKER:
**Q. After you met with Dr. Cutler, did she provide you the completed forms when you left that appointment?**
A. I can't recall.



**Q. Was it your understanding that these forms were to be returned to the fire department as part of the medical clearance process?**
A. I can't recall if I had to bring it in person or fax.
**Q. Okay. To your knowledge, were these forms returned to the fire department?**
A. To my knowledge, yes.
**Q. On Page 9 of the form -- of the packet, one of the questions that Dr. Cutler was asked on Page 9 is whether there have been any changes to the medications in the past 12 months. And I believe she noted that there had been an increase in the Pamelor dose, P-A-M-E-L-O-R.**
**Do you recall an increase in the dosage of that medication during that 12-month period?**
A. If my psychiatrist wrote it, then it happened.
**Q. Would the same be said on Page 12?**
**The question was posed to Dr. Cutler, has your patient had any symptoms of depression or bipolar disease in the past 12 months?**
MS. WILLENSON: I don't have a 12.
MS. BECKER: Oh, I'm sorry, 11. The last page

is 11.
BY MS. BECKER:
**Q. The first question that Dr. Cutler was asked is, has your patient had any symptoms of depression or bipolar disease in the past 12 months.**
**You don't have bipolar disease, do you?**
A. I do not have bipolar disease.
**Q. And you've never had bipolar disease?**
A. I've never had bipolar disease.
**Q. So I just want to eliminate that part of the question.**
**Symptoms of depression, she checked the box yes that you had had symptoms of depression in the past 12 months.**
**Do you -- do you recall having symptoms of depression within the past 12 months of her completing this form?**
A. I can't recall.
**Q. So, as I understand it, the form went back to the fire department, you believe, but you're not sure whether you returned it or if Dr. Cutler returned it; is that correct?**
A. That's correct.



**Q. Okay. What happened next in the medical clearance process from your perspective?**
A. What happened?
**Q. What happened next?**
**So you met with Dr. Cutler. You asked her to fill out these forms.**
**What was next?**
A. I believe I had to meet with my PCP to check blood pressure as required from Dr. Wong.
**Q. Okay. And did you do that?**
A. Yes.
**Q. Okay. And did you also have paperwork for your PCP to fill out and return to the fire department?**
A. I can't recall.
**Q. Okay. What happened next?**
MS. WILLENSON: I'm just gonna object to foundation as it relates to the order of these things.
We don't have any evidence that this exam or this -- the return of the paperwork from Dr. Cutler was before or after the PCP or before or after anyone else.
MS. BECKER: Okay.



BY MS. BECKER:
**Q. What happened next?**
A. What happened next after what?
**Q. What do you recall happening next with respect to the medical clearance process?**
MS. WILLENSON: Same objection.
THE WITNESS: I was to wait to hear back from Dr. Wong regarding these -- the medical follow-up.
BY MS. BECKER:
**Q. Okay. At some point were you asked to meet with a Dr. Goldstein?**
A. Yes.
**Q. Do you recall when you were asked to meet with Dr. Goldstein?**
A. I don't recall. I was told that -- I don't recall the exact date or order.
MS. BECKER: Okay. That's fine.
I'll show you what we'll mark Plaintiff's Deposition Exhibit 8.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 8 was marked for identification.)
BY MS. BECKER:
**Q. Mr. Sintos, I've handed you what's been**



**marked Plaintiff's Deposition Exhibit 8. It's a one-page document Bates-labeled Sintos Def 222.**
**Do you recognize this document?**
A. I do not recognize this document.
**Q. Okay. Do you recall going to Isaac Ray Forensic Group at 65 East Wacker Place to meet with Dr. Goldstein?**
A. Yes.
**Q. Did you, in fact, meet with Dr. Goldstein?**
A. Yes.
**Q. And does this help refresh your memory as to whether that meeting would have taken place on February 13, 2019, or do you not recall the exact date?**
A. I can't recall the exact date right now.
MS. BECKER: We've been going almost an hour. So why don't we take a five-, ten-minute break.
THE WITNESS: Okay.
MS. BECKER: Let's do that.
MS. WILLENSON: Which? Or should we just say -- do you want to say 10:05?
MS. BECKER: Sure, sure.
(WHEREUPON, a short recess was taken.)

BY MS. BECKER:
**Q. Mr. Sintos, you suffer from depression, correct?**
A. Correct.
**Q. And I think the term I've seen in some of the documents is major depressive disorder; is that correct?**
A. Correct.
**Q. Can you describe for me how that impacts you?**
MS. WILLENSON: Object to the form.
Go ahead.
THE WITNESS: Yeah. It's -- some days it's hard to get out of bed. Some days I can't focus on anything. You know, it's very isolating. Some days I don't want to see friends or family.
Almost feels like there's like an elephant sitting on your chest, and that -- you know, it makes it hard just to be living life to the fullest, I suppose.
BY MS. BECKER:
**Q. You had previously indicated that around 2013 is when you first started experiencing depression; is that correct?**



A. That's correct.
**Q. Okay. Do you still have moments when you experience the symptoms you just described?**
MS. WILLENSON: Object to the form.
Go ahead.
THE WITNESS: Yes.
BY MS. BECKER:
**Q. Okay. Walk me through -- so it's been about 10 years, right?**
A. Yes.
**Q. Okay. Walk me through what you've done to alleviate some of these symptoms that you've described.**
MS. WILLENSON: Object to the form.
Go ahead.
THE WITNESS: I regularly see a therapist, a psychiatrist. And they both -- they both treat me with -- my psychiatrist with medication and my therapist with talk therapy.
BY MS. BECKER:
**Q. Have there been periods -- anything else?**
A. No.
**Q. Have there been periods when you stopped seeing your therapist?**



A. Yes.
**Q. What periods have you not saw a therapist?**
A. I can't recall the dates.
**Q. What are the periods that you've stopped seeing your psychiatrist?**
A. Can you repeat the question?
**Q. Are there times in the past 10 years when you've stopped seeing your psychiatrist?**
MS. WILLENSON: Object to the form.
THE WITNESS: Yes.
BY MS. BECKER:
**Q. Okay. When?**
A. I can't recall specific dates.
**Q. Okay. Over the past 10 years has your medication changed?**
A. Yes.
**Q. Okay. Have there been periods where you've taken no medication at all?**
A. Yes.
**Q. And have there been periods where you've stopped taking medication without telling your doctor?**
A. One time, yes.
**Q. When is that?**



A. I can't recall the dates.
**Q. Okay. Was it before you did not make it through the medical clearance process at the fire department?**
MS. WILLENSON: Object to the form.
BY MS. BECKER:
**Q. If you know.**
A. I don't remember the dates.
**Q. Okay. And that time when you stopped taking your medication, why did you stop taking your medication?**
A. If I recall, putting all of my medical history out on paper, medication, suicide attempt, hospital stay, that created a stigma for me which caused me to be completely embarrassed of seeking mental health professionals. And so I just stopped.
**Q. Okay. For how long was it that you were taking no medication?**
A. I don't recall. I don't think it was very long.
**Q. When you stop taking your medication, how does it impact you?**
A. I am unable to do most things that require

living a productive life.
**Q. Like what? Do you have any examples?**
A. Sure. I mentioned earlier the current symptoms I have for depression. And if I'm not on medication, it feels like those symptoms increase tenfold.
**Q. Okay. And those are the symptoms we talked about right after the break, correct?**
A. Correct.
**Q. Okay. Throughout your treatment for depression, I believe you indicated that there have been periods where your medication dosages have had to be adjusted; is that correct?**
A. Correct.
**Q. How is it or what happens that causes a medication dosage to need to be adjusted?**
MS. WILLENSON: Object.
BY MS. BECKER:
**Q. I mean, is it something that you experience or symptoms you start having or something else?**
MS. WILLENSON: Object to the form.
THE WITNESS: I try not to -- let me start over.



This is all through working with my psychiatrist, and we work together. If things don't feel like they're stable, then we can change the dosage or the medication itself.
BY MS. BECKER:
**Q. What do you mean by if things don't feel stable?**
A. I suppose how I would rank my mood with my doctor.
**Q. Anything else?**
A. Not that I can think of.
**Q. Are there times when you're taking your medication that you begin experiencing some of the symptoms we talked about? Like it's hard to get out of bed or you can't focus or isolate -- or you feel isolated?**
**Are there times when even on your medication you experience those symptoms?**
A. Sometimes.
**Q. Okay. And when that happens, do you report that and share that with your psychiatrist?**
A. Yes.
**Q. And has that ever caused him or her to then adjust your medication dosages?**



A. Yes.
**Q. Is part of suffering from depression, anxiety, having panic attacks?**
MS. WILLENSON: Object to the form.
BY MS. BECKER:
**Q. Do you have panic attacks?**
A. Which question would you like me to answer?
**Q. The last one. I'll withdraw the first one.**
**Do you have panic attacks?**
MS. WILLENSON: Objection to foundation.
Go ahead.
THE WITNESS: I don't know the exact medical definition of a panic attack. I believe that anytime I've used the phrase panic attack to a provider or a psychologist, it was more in the hyperbolic sense.
BY MS. BECKER:
**Q. When you use the term panic attack -- when you believe you have a panic attack -- I understand we can set the definition -- what is actually happening to you or what do you experience?**
A. Sure. Heart's racing, sweating -- I don't



know -- just feeling like I need to take a moment to stop and take deep breaths. So I guess that would be what I at the time considered a panic attack.
**Q. Okay. When was the last time you had what you consider to be a panic attack?**
A. I can't recall exactly.
**Q. More than a year?**
A. Yes.
**Q. More than two years?**
A. I don't recall.
**Q. Have you ever had a panic attack while you're taking the medication that's been prescribed to you by your psychiatrist?**
A. The medication that I was taking at the time for anxiety was as needed. It was not to -- it was not a maintenance medication. If I felt like my anxiety was starting to rise, I would take an anxiety med.
**Q. You raise an interesting point, so I think we need to make a distinction.**
**You take medicine for anxiety not as a maintenance, meaning every day or on a regular basis, but only as needed; is that correct?**

A. Are we talking currently?
**Q. Another good question. Let's talk -- let's start with currently. Yeah.**
**Currently, what are you taking for depression and/or anxiety?**
A. Sure. I take a mood stabilizer called lamotrigine. I can't remember the dosage off the top of my head. This is for depression.
I take a maintenance med called gabapentin. That would be for overall anxiety.
There's another medication I take as needed called propanolol.
**Q. The medication that you said was a mood stabilizer for depression, do you take that for maintenance or as needed?**
A. Maintenance. And that's also in conjunction with another antidepressant called Celexa.
**Q. Do you take that for maintenance as well?**
A. Yes.
**Q. Okay. And then the medication that you said you take for anxiety, what's the -- what was the name of it?**
A. Which one?



**Q. The first one.**
A. Gabapentin.
**Q. Do you take that for maintenance or as needed?**
A. Maintenance.
**Q. Okay. Do you take any medication for anxiety for maintenance?**
A. Gabapentin.
**Q. Okay. Got it.**
**Okay. In early 2019 when you were going through the medical clearance process, do you recall what medications you were taking at that time?**
A. I believe it's in one of these forms that's sitting in front of me.
Would you like me to --
**Q. No.**
A. Okay.
**Q. I have your records. I probably have it all in there. I'm just asking you what you recall.**
A. I think at the time of processing I was on a medication called nortriptyline.
**Q. Okay.**
A. For maintenance for depression.



**Q. So if that was for maintenance for depression --**
A. There was an additional medication.
I'm sorry to speak over you.
**Q. That's okay.**
**That was something you were taking on a regular basis?**
A. Yes.
**Q. Okay. And then what else was it that you were taking?**
A. Ativan.
**Q. And what were you taking that for?**
A. Anxiety as needed.
**Q. Okay. When was the last time there was a change in your medications?**
A. I can't recall exactly.
**Q. Within the past year?**
A. Within the past 12 months?
**Q. Yeah.**
A. I can't recall exactly.
**Q. Do you recall why there was a change the last time there was a change in your medications?**
A. Sure. I've seen many psychiatrists. They just -- a revolving door of them, whether they move



on or they were residents.
To me, each doctor had a different view and wanted to try a different plan. So that would be a reason why we would change medications.
**Q. Okay. Is it frustrating to you when you need to change doctors or psychiatrists or therapists because of kind of the revolving door you mentioned?**
A. Yeah. It's frustrating.
**Q. Are there times when you get a new psychiatrist or there's a new person who wants to try their treatment plan that adjusts your medication that then creates symptoms for you or creates issues?**
MS. WILLENSON: Object to the form.
BY MS. BECKER:
**Q. If you understand.**
A. Would you mind repeating it?
**Q. Yeah, sure. I'm just trying -- I think what you said is, you know, you've changed -- you've had a lot of psychiatrists over -- psychiatrists are the ones that prescribe medication, correct?**
A. Correct.

**Q. All right. So you've had a number of psychiatrists over the years who have treated you, right?**
A. Yes.
**Q. And I think what you said is sometimes when there's a change or a shift, you know, they may have a different philosophy or a different belief about what medications are appropriate, so they may adjust your medications?**
A. Yes.
**Q. Are there situations when you had that occur that have caused or created symptoms for you by having to adjust your medications?**
A. Yes.
**Q. Can you give me an example?**
A. I can't give you a specific example.
**Q. Okay. Can you think of an instance where you've changed psychiatrists which resulted in a change in medications where it caused an issue for you in your maintenance of your depression and anxiety?**
A. I can't recall specifically.
**Q. Can you recall generally?**
A. In a very general sense I understand that



changing medications when your body is so used to one can have an effect, generally speaking.
**Q. And has that occurred for you?**
A. Yes. As far as physical chemistry goes, yeah.
**Q. Since February of 2019, have you had any panic attacks?**
A. Again, barring the -- what might be the medical definition of a panic attack?
**Q. Of course. Understanding it's only what you described that you experience that you've labeled as a panic attack.**
A. Yes. I can't recall exactly.
**Q. Since February of 2019, have you had any medical issue that's kept you from working?**
A. Can you repeat that?
**Q. Sure.**
**Since February of 2019, have you had any medical issue whether it's an illness or an injury that's prevented you from working?**
A. I've taken sick days, if that's what you're asking me.
**Q. No.**
A. No.



**Q. Nothing other than just sick days?**
MS. WILLENSON: I object to the form.
Go ahead.
THE WITNESS: What was the date you asked?
BY MS. BECKER:
**Q. February 2019.**
A. I can't recall.
**Q. Okay. In some of your medical records I've seen reference to binging and purging.**
**Is that something that's a symptom of either your depression or anxiety or is that something else?**
MS. WILLENSON: Object to the form.
THE WITNESS: I don't know. I do not know exactly.
BY MS. BECKER:
**Q. Is that something else that you work with your therapist and your psychiatrist on?**
A. Yes.
**Q. Prior to meeting with Dr. Goldstein, had you known or ever met her?**
A. No.
**Q. Tell me about -- did you only go down to her office on one occasion?**



A. Yes.
**Q. Okay. How long were you there for?**
A. I can't recall.
**Q. What do you recall about that appointment?**
A. I remember there was a very long questionnaire that I had to complete, and then we had a one-on-one conversation.
**Q. Was anyone else present in the conversation other than you and Dr. Goldstein?**
A. I believe so. I'm sorry. No.
**Q. How long did you have a conversation with Dr. Goldstein for?**
A. I can't recall.
**Q. During that meeting did Dr. Goldstein say or do anything that you found to be offensive?**
A. Could you define offensive?
**Q. Let me ask a different question.**
**Did she do or say anything that you found to be unprofessional?**
A. I am not -- I don't work in her field. So I don't really know what would be professional or not as far as she goes.
**Q. Nothing stands out in your mind?**
MS. WILLENSON: Object to the form.

BY MS. BECKER:
**Q. Go ahead.**
A. Nothing stands out in my mind.
**Q. I'm asking you from that appointment, something unusual or something that surprised you or that you didn't expect?**
A. Yeah. Dr. Goldstein at one point questioned one of my diagnoses that my own doctor had given me.
**Q. How did she do that?**
A. If I recall, something to the effect of -- it was almost like she was trying to diagnose me when that wasn't what we were doing there.
She said, that doesn't sound like X; it sounds like Y. I don't remember the specifics.
**Q. Do you know what X and Y were?**
A. Something regarding anxiety.
**Q. Okay. And you said you didn't think that was the purpose.**
**What did you understand the purpose of you meeting with Dr. Goldstein was to be?**
A. To determine if I was fit for the fire department.
**Q. After that meeting with Dr. Goldstein, did**



**you ever meet with her again?**
A. I can't recall.
MS. BECKER: I'm gonna show you some more paperwork that we'll mark as Plaintiff's Deposition Exhibit 9.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 9 was marked for identification.)
THE WITNESS: Oh, I remember.
BY MS. BECKER:
**Q. What was that, Mr. Sintos?**
A. I said I remember this. Earlier you had asked me if I felt that Dr. Goldstein did something offensive or unprofessional.
**Q. Yeah.**
A. She had asked me about my relationship with my father and our history together. And at the time I spoke with her about it, I didn't know what -- if I refused to answer something, how it would affect my results.
And in retrospect, I believe that that was irrelevant to whether I could be a firefighter or not.
**Q. Okay. And when you're referring to your**



**history with your father, you're referring to -- you're referring to what you had reported, I believe --**
**(Reporter clarification.)**
BY MS. BECKER:
**Q. You're referring to an abusive history with him?**
A. I can't recall the exact nature of the conversation.
**Q. That was something you didn't think Dr. Goldstein should have gotten into?**
A. Correct.
**Q. Okay. Anything else that you recall?**
A. No.
**Q. So I've just handed you what's been marked Plaintiff's Deposition Exhibit 9. It's a packet at the top entitled, Isaac Ray Forensic Group biographical questionnaire. And it's Bates-labeled Isaac Ray 259 through 282.**
**Do you recognize this packet?**
A. Yes, I recognize it.
**Q. Okay. You had previously indicated that there was paperwork that you had filled out when you went to Dr. Goldstein's office.**



**Is this some of the paperwork that you filled out?**
A. This is some of it, yes.
**Q. Okay. And is this paperwork you provided to Dr. Goldstein before she interviewed you?**
A. I can't recall before or after.
**Q. Okay. Is it paperwork that you left at Dr. Goldstein's office when you left that day after the appointment?**
A. I can't recall exactly.
**Q. All right. Looking at the first page of this exhibit, there's writing above the title of the document.**
**You don't recognize that as your writing, do you?**
A. I do not recognize that as my writing.
**Q. Okay. Everything below the title, do you recognize that as your handwriting?**
A. Yes.
**Q. On Page 2, is this all of your handwriting?**
A. Yes.
**Q. Page 3, in response to Question 18 it looks like kind of outside the lines there's some**

**notes about emotional verbal abuse, anxious.**
**Do you see that?**
A. I see that.
**Q. And then 2012, 2013, that section says parents split. He returned to the Philippines.**
**Do you see that?**
**That's not your handwriting, is it?**
A. That's not my handwriting.
**Q. Everything else on this page, is that your handwriting?**
A. No.
On Section 20, something says cultural. That's not my handwriting.
**Q. Okay. Everything else is, though?**
A. Yes.
**Q. Okay. And the reference here about parents split and he returned to the Philippines, is that what you were referencing earlier as a topic that you didn't think Dr. Goldstein necessarily needed to get into?**
A. Part of it.
**Q. Okay. All right. Page 4, there's a note here about four to five preteen.**
**That's not your handwriting, is it?**



A. That is not my handwriting.
**Q. Does everything else, the boxes checked, appear to be the boxes that you checked when you filled out this form?**
A. Yes.
**Q. Next page, there's a handwritten note below the first question above educational history.**
**That's not your handwriting, correct?**
A. No.
**Q. And, similarly, under educational history kind of written in the lines, one class had to repeat.**
**Do you see that?**
**That's not your handwriting, is it?**
A. That is not my handwriting.
**Q. Other than that, is every everything else on this page yours?**
A. No.
**Q. What else isn't yours?**
A. There's something in Question 4.
**Q. Temp agency for healthcare?**
A. Yes.
**Q. Okay.**
A. That is not my writing.



**Q. Everything else yours?**
A. Yes.
**Q. Next page, does this all appear to be your handwriting?**
A. Yes.
**Q. All right. The next page, 265, there are some notes in the chart in the middle of the page about together since 2016.**
**And in that section, that's not your handwriting, is it?**
A. No, it is not.
**Q. Okay. Other than that, is everything else on the page your handwriting?**
A. No.
**Q. What else isn't?**
A. Well, there's a -- looks like there's a line striking through some words under the name Natalie Malinowski, that's not mine.
**Q. The arrow?**
A. Yeah. Oh, it's an arrow?
**Q. Anything --**
A. This document is kind of hard to read. I can't tell if it's my writing or Dr. Goldstein's.
**Q. Okay. Natalie Malinowski was your fiancee**



**at the time, correct?**
A. Correct.
**Q. Did you ever marry Miss Malinowski?**
A. No.
**Q. Why not?**
A. After I got rejected from the fire department, I had a mood change that caused a lot of stress on the relationship. And eventually it ended.
**Q. When did the relationship end?**
A. October -- definitively October 2019.
(Reporter clarification.)
BY MS. BECKER:
**Q. Other than what we've identified on this page as not your handwriting, is there anything else on here that appears to not be yours?**
A. Again, this document is very faded, so I am having a hard time distinguishing.
**Q. Okay. All right. Let's go to the next page.**
**Does this all appear to be your handwriting?**
A. Yes.
**Q. The next page, there are quite a few notes**

**on here that look like perhaps they're not yours.**
A. What page?
**Q. The next page which is 267.**
**So on Question Number 4 under the chart that says hospital dates results, the first two lines that are filled out, that's your handwriting, right?**
A. Yes.
**Q. Okay. And then on Question 5 --**
A. Wait. Sorry, there's some writing underneath here.
**Q. Okay. Just those two lines --**
A. Yes.
**Q. -- I was looking at?**
A. Yes.
**Q. That's yours, right?**
A. Yes.
**Q. Then on Question 5 under medication, there are five medications listed.**
**For those -- do you see that?**
A. Yes.
**Q. For those five medications and then the dates, the amounts and the reason, is that your handwriting?**



A. Yes.
**Q. Okay. I understand there's notes all around it that likely isn't yours.**
**And then on the bottom, Question 8, where it has physician, type of care, approximate date, those first two lines where it has Dr. John at Rush and Dr. Cutler at Rush, that's your handwriting across those lines, correct?**
A. The first two lines?
**Q. Yeah.**
A. Yes.
**Q. Everything below that doesn't appear to be yours, right?**
A. Right.
**Q. Okay. The next page which is 268, does this all appear to be your handwriting?**
A. Not all of it.
**Q. What isn't?**
A. I don't know. There seems to be writing under the autism section.
**Q. Anything else?**
A. No.
**Q. The next page, on Question 5 there's a note on the side, last five years. And then for**



**Question 6 there's a note that says just because got on meds.**
**Other than those two sections, does everything else appear to be your handwriting?**
A. At the very top of the page where it says alcohol or drug problems -- never mind.
Everything else appears to be in my handwriting.
**Q. Okay. The next page looks like there's a lot of notes on it, and it's hard to read.**
**Doesn't it?**
A. Yeah. Yes.
**Q. Okay. Let's just focus on the boxes that are checked.**
A. Okay.
**Q. For question -- for all of the questions, do those appear to be your checks on the boxes?**
A. I can't say for certain.
**Q. Okay. For Question 3, have you ever been given a psychiatric diagnosis; if yes, to your knowledge what was the diagnosis -- that entry written next to there, major depression, that's your handwriting, correct?**
A. It's so blurry that I can't be for



certain.
**Q. Yeah. It's a bad page.**
**Okay. Let's go to the next page. There's a note at the top, no other time. That's not yours, right?**
**Does everything else appear to be yours?**
A. Everything else other than that note appears to be mine.
**Q. Okay. Next page which is 272, did you fill out this page?**
A. I think so. Yes.
**Q. 273, does this all appear to be your handwriting?**
A. Yes.
**Q. 274, there's no handwriting on it.**
A. Okay.
**Q. You have no military background, correct?**
A. Correct.
**Q. 276, is that your -- did you fill out this page?**
A. Yes.
**Q. 277, other than for Question 2 -- there's a note, taillight at electrical problem -- does everything else appear to be yours?**

A. There is also something in Number 6.
**Q. Okay. Took allergy meds and got drowsy?**
A. Yeah.
**Q. Everything else yours?**
A. Yes.
**Q. Okay. 278, did you fill out everything on this page?**
A. Yes.
**Q. 279, same question, did you fill out everything on this page?**
A. Yes.
**Q. Did you ever file a lawsuit regarding the dog bite?**
A. No.
**Q. 280, does this all appear to be your handwriting?**
A. Yes. Yes.
**Q. 281, it looks like in response to Question 9 there's some handwriting, while. And then there's scribble under it.**
**Is everything else your handwriting other than those two lines?**
A. Yes.
**Q. Okay. And then the last page, 282, that's**



**not your handwriting, correct?**
A. No.
**Q. When you left that appointment with Dr. Goldstein, did you know what her recommendation would be to the fire department?**
A. No.
**Q. And did you ever communicate with Dr. Goldstein again?**
A. I can't recall.
**Q. What do you recall next about the medical clearance process?**
A. Waiting.
**Q. How long did you wait for?**
MS. WILLENSON: Object to the form.
Go ahead.
BY MS. BECKER:
**Q. If you know.**
A. I can't recall the exact amount of time.
**Q. At some point did you have a conversation with Dr. Wong?**
A. At some point, yes, I had a conversation with Dr. Wong.
**Q. Okay. Did that conversation take place in person or over the phone?**



A. Over the phone.
**Q. How many conversations did you have with Dr. Wong after your meeting with Dr. Goldstein?**
A. I believe it was one conversation.
**Q. Okay. And you said you believe it was over the phone?**
A. Yes.
**Q. Did you call him or did he call you?**
A. After I sent a lot of follow-up emails to him with no response, he finally called me.
**Q. Okay. Was anyone else on the line other than you and Dr. Wong, to your knowledge?**
A. To my knowledge, no.
**Q. How long did the conversation last?**
A. It was a short conversation. I can't recall the duration exactly.
**Q. What do you recall was discussed during the conversation? What did he say to you? What did you say to him?**
A. He explained that he could not put me on the job. And I can't recall exactly what I said to him.
**Q. Did he say anything else?**
A. Nothing else other than his reasons for



not putting me on the job.
**Q. Did he give you reasons for not putting you on the job?**
A. He -- if I recall, I think he said -- he referenced Dr. Goldstein's conclusion as to not recommending me for the position.
**Q. Anything else?**
A. As far as I recall, no. I can't remember.
**Q. Did you say anything else?**
A. I said something because that wouldn't be a great phone call if I didn't say anything, but I don't remember what I said exactly.
**Q. Did you ask any questions?**
A. I'm sure I did, but I can't remember.
**Q. Okay. And I understand you might not recall exactly what you said, but do you recall generally what you said?**
A. No, I can't recall. I'm sorry.
**Q. It's okay.**
**Do you recall anything else being said during that conversation?**
A. No, I cannot recall.
**Q. Is that the last time you ever communicated with Dr. Wong?**

A. I think so.
**Q. Did you ever receive written confirmation from the fire department that you would no longer be part of the clearance process or that you were no longer part of the application process?**
A. I think so.
MS. BECKER: Okay. Let's mark the next document as Plaintiff's Deposition Exhibit 10.
(WHEREUPON, Plaintiff's Deposition Exhibit No. 10 was marked for identification.)
BY MS. BECKER:
**Q. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 10. It's a one-page document Bates-labeled Sintos Def 226.**
**Do you recognize this communication?**
A. Yes.
**Q. What is it?**
A. It is an email saying I am no longer being considered for further processing for the position of firefighter-EMT.
**Q. Okay. Do you recall receiving this email?**
A. Yes.
**Q. Do you know when you received the email?**



A. I don't recall.
**Q. Was it before or after you spoke to Dr. Wong on the phone?**
A. After.
**Q. During the -- well, after receiving this email, were there any further steps in the medical clearance process?**
A. No.
**Q. So it had come to an end?**
A. It just stopped.
**Q. Have we over the course of this morning talked about all that you can recall about the medical clearance process?**
A. As far as I recall.
**Q. Is there anything we haven't covered about the medical clearance process?**
MS. WILLENSON: Object to the form.
THE WITNESS: I can't recall.
BY MS. BECKER:
**Q. Okay. During the medical clearance process, did anyone who worked for or with the City of Chicago say anything to you that you thought to be unprofessional?**
A. I don't recall.



**Q. Through the medical clearance process, did anyone who worked with or for the City of Chicago say or do anything that you thought to be discriminatory?**
A. Can you repeat the question? I'm sorry.
**Q. Sure.**
**During the medical clearance process, did anyone who worked for or with the City say anything to you that you thought to be discriminatory?**
A. At the time I did not think these were discriminatory based on the fact that I don't really have a full grasp on what would be considered discriminatory or not.
**Q. Okay. Mr. Sintos -- well, you mentioned previously that after you were rejected from the fire department or didn't go through -- clear the medical clearance process that your mood changed.**
A. Yes.
**Q. What did you mean by that?**
A. I felt -- I felt a lot of shame which caused me to sort of retreat inward. I was incredibly embarrassed to be -- you know, have these diagnoses of depression and anxiety. And I just felt very down most of the time.



**Q. Did you start experiencing some of the symptoms we talked about earlier such as being hard to get out of bed?**
A. Yes.
**Q. Inability to focus?**
A. Yes, but in a stronger sense than normal.
**Q. In what sense?**
A. Well, we talked about earlier regarding current symptoms of what I feel to be depressive symptoms. Those are mild and less frequent.
But at the time after being rejected from the fire department, things felt heightened. The symptoms felt heightened.
**Q. What symptoms in particular?**
A. The isolation, the not finding any sort of joy out of things that I used to love doing, not wanting to be around people, things like that.
**Q. Anything else?**
A. I felt guilty and ashamed of myself.
**Q. How long did you experience these symptoms?**
A. Could you repeat the question?
**Q. Yeah. Well, you had indicated after you were rejected from the fire department that your**

**mood changed and that some of the symptoms we had talked about became more severe. I think that's what you said.**
**I'm just trying to understand how long that lasted for.**
A. I still struggle to this day.
**Q. Okay. Well, did you take any steps to address those symptoms you were experiencing?**
A. Yes.
**Q. What did you do?**
A. My therapy became more frequent. You know, worked more extensively with my psychiatrist to help me deal with a lot of this pain.
**Q. How did -- anything else?**
A. No.
**Q. How did the frequency of your therapy change?**
A. I would see my therapist weekly, sometimes twice a week.
**Q. And you worked with your psychiatrist on these issues, too?**
A. Yes.
**Q. Did you also use the more frequent therapy sessions to discuss the breakup with your fiancee?**



A. I'm sorry. Can you repeat this?
**Q. Yeah.**
**Well, did you use the more frequent therapy sessions to also help talk through and deal with the breakup of your fiancee?**
A. Yes.
**Q. And did you also work with your psychiatrist on dealing with the breakup of your fiancee?**
A. I worked with my psychiatrist just based on symptoms alone. There's not really much talk therapy happening.
**Q. Did the breakup with your fiancee impact you emotionally?**
A. Of course.
**Q. And how did that impact you?**
A. It added to the humiliation and shame of having this disease.
**Q. Did it exacerbate or increase any of the symptoms we've talked about of depression or anxiety? In your mind.**
A. To me, it felt like it was just piling onto the sort of downward spiral from after being denied from the fire academy -- fire department.



**Q. So you were denied from the fire department. You and your fiancee broke up.**
**Is there anything else that contributed to what you just referred to as the downward spiral?**
MS. WILLENSON: Object to the form, misstates his prior testimony.
Go ahead.
THE WITNESS: Not that I can recall.
BY MS. BECKER:
**Q. Okay. The mood change that you referenced after being rejected from the fire department, did that result in a change or shift in your medications?**
A. Yes. I can't recall the exact dates.
**Q. Okay. How did your medications change?**
A. How did they change?
**Q. Yeah. Like I think I asked you if there was a change, and you said yes.**
A. And you're asking to elaborate on that?
**Q. Yes.**
A. I'm sure we tried different medications.
**Q. Okay. Anything else?**
A. Not that I can recall.
**Q. Okay. Did you increase any of the doses**



**of medications you were already taking?**
A. I can't recall exactly if we tried raising dosages before changing to a new medication.
**Q. Okay. Those changes would probably be in your medical records, though, right?**
A. Yes.
**Q. Okay. Mr. Sintos, did you personally know anyone else who applied for employment with the fire department and was referred to Dr. Goldstein for an examination?**
A. No.
**Q. Do you know anyone else who was denied medical clearance after applying for the fire department?**
A. Yes.
**Q. Who?**
THE WITNESS: Am I allowed to say their name?
MS. WILLENSON: Yes.
THE WITNESS: A friend from high school named Martin Roland.
BY MS. BECKER:
**Q. I'm sorry. What was his name?**
A. Martin.
**Q. Martin Roland?**

A. R-O-L-A-N-D.
**Q. Do you know when Mr. Roland applied to work at the fire department?**
A. I don't know his dates.
**Q. Do you know when he went through the medical clearance process?**
A. I don't.
**Q. Was it before or after you were denied medical clearance?**
A. Before.
**Q. Do you know why he was denied medical clearance?**
A. Not exactly.
**Q. Have you discussed it with him?**
**Have you discussed his application process with him?**
A. Not extensively, maybe -- Marty actually referred me to Marni.
**Q. Okay. Do you know if Mr. Roland had filed a lawsuit against the Chicago Fire Department, if you know?**
A. I don't know.
**Q. And do you know anything about the circumstances surrounding his medical clearance**



**being denied?**
A. Not enough to say with any certainty.
**Q. Well, what do you know?**
A. That he's currently on the job.
**Q. That he was hired?**
A. Yeah.
**Q. Oh, okay.**
A. After the fact of . . .
**Q. So his medical clearance was initially denied?**
A. Yes.
**Q. His medical -- he has since become a member of the fire department?**
A. Yes.
**Q. Got it. Okay.**
**Have you ever worked at a fire department?**
A. No.
**Q. Other than your application with the Chicago Fire Department that brings us here today, have you ever applied to work at the Chicago Fire Department at any other time?**
A. No.
**Q. Okay. So you haven't submitted your application since being rejected in 2019?**



A. To the Chicago Fire Department?
**Q. Yes, to the Chicago Fire Department.**
A. No. As far as I know, they didn't open up any -- they didn't post that they were accepting applications.
**Q. Okay. And 2014, when you applied for a position at the fire department, that was the first time you had ever applied?**
A. Yes.
**Q. Other than your application with the Chicago Fire Department that formed the basis of this lawsuit, have you sought application with the City of Chicago or any of its departments?**
A. Yes.
**Q. Which ones?**
A. DCASE, Department of Cultural Affairs and Special Events.
**Q. Okay. Any others?**
A. Not that I can recall.
**Q. You applied to the Department of Cultural Affairs?**
A. Yes.
**Q. When?**
A. I want to say at some point last year.



**Q. Just one time?**
A. Yes.
**Q. What position did you apply for?**
A. I believe the position was called cultural coordinator.
**Q. Okay. Were you interviewed?**
A. Yes. Yes.
**Q. Did you get the job?**
A. No.
**Q. Do you know why you didn't get the job?**
A. No.
**Q. Okay. Did you only have one interview or did you go further through the interview process?**
MS. WILLENSON: Object to the form.
THE WITNESS: I can't recall if it was more than once.
BY MS. BECKER:
**Q. Is that the only other position you've applied for with the City of Chicago other than firefighter?**
A. Oh, no.
**Q. What else?**
A. I remember before applying to become a firefighter I applied to become a Chicago police

98

officer.
**Q. When?**
A. I don't remember the dates.
**Q. After you submitted your application, what happened with your application to the police department?**
A. I can't recall exactly. I chose not to -- I remember being asked to come in for a fitness test, and I chose not to.
**Q. Why?**
A. I did not want to be a police officer.
**Q. Any other positions with the City of Chicago that you've applied for?**
A. I can't recall.
**Q. Have since -- let me ask a more better question.**
**Have you ever applied to work at a fire department other than the Chicago Fire Department?**
A. No.
**Q. Since you were notified that you were being removed from consideration of employment with the Chicago Fire Department, have you looked to see if any other fire departments are hiring?**
A. Yes.

99

**Q. What have you done to look for other fire department postings?**
A. Google.
**Q. Google. Anything else?**
A. Not that I can recall.
**Q. Did you -- when you say you used Google to find other fire department postings, walk me through your search process.**
A. I'm sure it was something like Illinois fire departments job postings.
**Q. So you did one search?**
A. No. I searched it probably over time that same search.
**Q. Okay. When was your first search?**
A. I don't remember.
**Q. How many searches did you perform?**
A. I don't remember.
**Q. Over what period of time did you search using Google to find fire department openings?**
A. It was very casual. Just, you know -- there was no -- I did not have any sort of goal in mind. Just curious.
**Q. Just curious if other fire departments were hiring?**

100

A. Yeah.
**Q. So no goal in mind to actually get hired by another fire department?**
A. I considered it. I noticed when I was searching, a lot of these fire departments require certain certifications that you need to do on your own. Whereas, my understanding, the Chicago Fire Department doesn't require this going into it.
And that deterred me a lot of the time. I just didn't have the time to go to these classes.
**Q. Did you ever take any steps to look into the types of certifications that these other fire departments wanted?**
MS. WILLENSON: Object to the form.
THE WITNESS: Could you repeat that?
BY MS. BECKER:
**Q. Did you take any steps to learn or determine what it would have taken to get these other certifications?**
A. Yeah, but very casually out of curiosity. I think I saw some courses at a community college. But from what I had seen, it was full time, and I couldn't do that with my position at work.
**Q. Okay. So beyond casually looking at what**

101

**the requirements were for these other fire departments, you've never pursued any types of certifications?**
A. No.
**Q. Did you find any openings at fire departments?**
A. Again, I had seen job postings. Yeah.
**Q. So you knew there were job postings, but you didn't apply to any of them?**
A. I don't recall, but I don't think so.
**Q. How many job postings did you see?**
A. I couldn't say.
**Q. Did you look anywhere else other than the internet for postings at other fire departments?**
A. No.
**Q. How many times -- if you could quantify it, cause I know it was casual, but how many times do you think you went on Google to look for job postings with other fire departments?**
A. I couldn't quantify it.
**Q. More than 10?**
A. I could not say for certain.
**Q. More than 20?**
A. Again, I couldn't say for certain.

**Q. Did you talk to anyone about openings at other fire departments or -- strike that.**
**Did you talk to anyone to see if there were other openings at other fire departments?**
A. I can't recall.
**Q. Nothing comes to mind?**
A. Nothing comes to mind.
**Q. Did you keep any lists or records of either the dates -- of the dates when you searched?**
A. No.
**Q. Did you keep any notes or records of the positions that you saw available?**
A. No.
**Q. Did you keep any notes or records of the certifications that you believe were required for other fire departments?**
A. No.
**Q. Did you keep notes or records of anything related to looking at potential employment at other fire departments?**
A. No.
**Q. Why not?**
A. The certification aspect deterred me.
**Q. Did you look or do any research to see**



**whether there were fire departments that didn't require certifications?**
A. I can't recall for certain. I never noticed, but as far as I know Chicago is one of the few that doesn't require this.
**Q. Okay. When you looked for openings at other fire departments, did you define a geographic range?**
**Did you limit your search, so to speak, within a certain geography?**
A. To the state of Illinois. That was only where I was looking.
**Q. Okay. So you didn't go across the board and look at Indiana to see if there were any job postings in Indiana?**
A. You know, I -- it almost -- it didn't matter geographically where I looked because I didn't really want to move out of Chicago. And I definitely wouldn't want to move to Indiana.
**Q. How far is your house from Indiana?**
A. I don't know exactly. I mean, I could get there probably, no traffic, maybe a half hour. I mean, obviously it's not that far away. You know where Indiana is.



**Q. To your knowledge, do all fire departments have residency requirements like the City of Chicago?**
A. I can't say for sure.
**Q. Did you ever look to see whether there were fire departments in Indiana that didn't have residency requirements?**
A. No. I think that even in looking at other fire departments, the salary and the benefits were -- did not seem nearly as good in my opinion. I couldn't give you numbers, though.
**Q. So the salary and benefits deterred you even though the camaraderie and all the other reasons why you wanted to be a firefighter might have still been present?**
A. I still want to make money despite also wanting to experience those things you listed.
MS. BECKER: Okay. We've gone another hour. Do we want to take a break?
THE WITNESS: I could use a break.
(WHEREUPON, a short recess was taken.)
MS. BECKER: Okay. Back on the record.



BY MS. BECKER:
**Q. Mr. Sintos.**
A. Yes.
**Q. I know that you've been working as a medical coder since 2010 at the same place, but -- we've talked about the fire department, but we haven't talked about other -- really other employment.**
**Have you -- well, you applied at the cultural center?**
A. Yes.
**Q. Have you applied anywhere else since February of 2019?**
MS. WILLENSON: It was DCASE, not the cultural center, just to be --
MS. BECKER: It was what?
MS. WILLENSON: DCASE.
BY MS. BECKER:
**Q. What is that?**
A. Department of Cultural Affairs.
**Q. Thank you.**
**Have you applied anywhere else other than the Department of Cultural Affairs since February of 2019?**

A. Not that I can recall.
**Q. Have you looked for employment anywhere else since February of 2019 other than what we've discussed about your searches for fire departments?**
A. Sure.
**Q. Have you looked anywhere else?**
A. Nothing seriously.
**Q. Anything casually?**
A. Yeah. I look. I look on some of those job posting websites. And occasionally I look on Taleo, which is the City of Chicago's job posting website, just to see what's there.
**Q. And when you refer to other job posting websites, what websites are you referring to?**
A. Glass Door, I think. I can't remember the names off the top of my head.
**Q. Have you found any positions you're interested in since February of 2019?**
A. No.
**Q. Other than the one City department, you haven't applied anywhere else -- and DoorDash, you haven't applied anywhere else since February 2019?**
A. No.
**Q. Have you -- I'm sorry. I didn't mean to**



**cut you off.**
A. I was going to say the rejection from the fire department really affected my confidence in applying for other positions.
**Q. And that's why you haven't applied for any other positions?**
A. [Nodding].
**Q. Okay.**
A. Yes.
**Q. And do you have any notes or anything in writing about positions you looked at or seen on Glass Door or Taleo or anything else?**
A. No.
**Q. I understand you're in a band?**
A. Yes. Yeah.
**Q. And what's the name of your band?**
A. The Flips.
**Q. What kind of music do The Flips play?**
A. It's an alternative rock band.
**Q. How long have you been a member of The Flips?**
A. 2010, but I was making music since high school.
**Q. What is your role in the band?**



A. I sing and play guitar. I write the songs, and then I'm also -- I also manage the band.
**Q. Prior to being a member of The Flips in 2010, were you a member of any other band or did you just play music?**
A. Nothing officially. I just play music.
**Q. Okay. I know you said you're a writer.**
**Are you the only band member who writes music?**
A. For The Flips, yes.
**Q. So you write all the music?**
A. Yes.
**Q. Do you all do -- sorry, go ahead.**
A. I write the words in the music, but not necessarily all the instrumentation.
**Q. Does your band do covers, too, or is it --**
A. Not really. It's original music.
**Q. Okay. Have you released any albums?**
A. Yes.
**Q. How many?**
A. Six.
**Q. What years did you release albums?**
A. 2011, 2013, 2015, 2018 and just this year, this past year. Oh, 2020. I think that's all.



**Q. And those were full length albums?**
A. Three were. Others were EPs.
**Q. And EP is like a half an album, like six, seven, songs, right?**
A. Yeah, yeah.
**Q. Okay. Other than the EPs and the albums, have you also released singles?**
A. No. I'm featured on another band's single playing guitar, but that's pretty much it.
**Q. One single?**
A. Yeah.
**Q. What band is that?**
A. They're called Hi Ho.
**Q. And when were you featured or when was that song released?**
A. I think it was this year.
**Q. How many total songs are in The Flips catalog?**
A. I don't know off the top of my head.
**Q. Have you ever toured?**
A. Regionally, yes.
**Q. Okay. How many tours have you gone on?**
A. I can't say for certain.
**Q. When did you start touring?**

110

A. Maybe 2012.
**Q. When was your last tour?**
A. Before COVID.
**Q. So you haven't toured since COVID. Have you had gigs since COVID?**
A. Yes.
**Q. Are those all local?**
A. Yeah.
**Q. The past -- say 2023, how many gigs have you had?**
A. Not many. Less than 20.
**Q. Out of the -- you know, you've been performing with the band for a number of years.**
**Is there any particular year where you had the most concerts, the most performances? If so, when was that?**
A. I don't know.
**Q. Okay. You're the band manager?**
A. Yeah.
**Q. Okay. Are you part of a record label?**
A. No.
**Q. Are you working on any deals right now to be part of a label?**
A. No.

111

**Q. Is it your desire to make the band your full-time job?**
A. It was at one point.
**Q. At what point?**
A. Prior to the pandemic.
**Q. What has changed that makes it not your desire to be a full-time band member?**
A. I have friends who are full-time band members and watching them struggle to make ends meet, watching music venues struggle to make ends meet was really disheartening.
And I just felt -- then there was that shift for me where I was like maybe this isn't a full-time thing for me.
**Q. Is it a full-time job for any of your band members?**
A. No.
**Q. I imagine being a band member, writing the music and being the manager is a lot.**
**What do you do as the manager?**
A. I'm responsible for booking the gigs and tour dates, when there are some, and getting merch printed and designed, getting album art printed and designed, you know, making sure that we're meeting

112

deadlines as far as when we're putting records out. And, yeah, just communicating with venues and to the rest of my band mates.
**Q. Do you work with any third parties in putting your records out?**
A. We use distribution services. One is called CD Baby. One is called DistroKid, D-I-S-T-R-O, Kid.
**Q. Currently, what would you -- how would you quantify your commitment to the band?**
MS. WILLENSON: Object to the form.
BY MS. BECKER:
**Q. How many hours a week do you spend either working as the manager or writing music or playing music with the band?**
A. I try to work on music at least an hour a day. When -- this year we were making an album, and so it's hard for me to quantify how many hours I put into it. It was pretty extensive, but it makes me feel good.
**Q. Some days more than others, obviously, depending on if you're in the recording studio or if you're writing or what you're doing, right?**
A. Yes. I consider it a very extensive -- a

113

very expensive passion project.
**Q. Okay. Do you manage any other artists?**
A. No.
**Q. How's the band revenue?**
A. What's that?
**Q. Are you paid as a manager of the band?**
**Do you get a percentage of revenue?**
A. No. Most of the money we make as a band just goes back into the band in terms of gas, any expenses it takes to create merch and produce records.
**Q. As the manager do you have a -- do you have a contract with the band?**
A. Manager is sort of a loose term. I lead the band in that sense.
**Q. Okay. Is anyone in your band -- I know you said, you know, you've kind of recognized it's not going to be the full-time position for you.**
**Are there other band members that are still working on making it --**
A. No.
**Q. -- a full-time position or has the band shifted in general?**
A. None of the band members are working

towards becoming a full-time musician.
At some point we decided the minute it stops being enjoyable for us, then we'll just stop doing it. And that hasn't happened yet.
**Q. What's the biggest venue you've played?**
A. House of Blues. I don't know what the cap is, though. We've also played the Metro, but I think the House of Blues is bigger.
**Q. How many times have you played at the House of Blues?**
A. Twice.
**Q. What years?**
A. 2015 and 2016.
**Q. How about the Metro?**
A. I want to say 2018.
**Q. Okay. Just one time?**
A. Yes.
**Q. Let's talk about your income from medical coding. I understand that your salary in 2019 was around 20 -- 47,000.**
**Does that sound about right?**
A. I think so.
**Q. Okay. Did you get a raise in 2020?**
A. I don't -- I don't recall.



**Q. What's your current salary?**
A. Just south of 53.
**Q. You only delivered for DoorDash for one day?**
A. Yeah.
**Q. The medical coding, are you on a salary or are you hourly?**
A. I make a salary, but I'm eligible for overtime.
**Q. Okay. Do you work overtime?**
A. Occasionally.
**Q. The past year about how much overtime did you work?**
A. I don't recall.
**Q. What's your hourly rate for overtime?**
A. Time and a half, so -- I don't know the math off the top of my head.
**Q. Do you have any income other than your job as a medical coder?**
A. No.
**Q. No band income?**
A. Nothing to me personally.
MS. BECKER: Okay. Let's mark two documents this time.



(WHEREUPON, Plaintiff's Deposition Exhibit Nos. 11 and 12 were marked for identification.)
BY MS. BECKER:
**Q. Mr. Sintos, I've handed you what's been marked Plaintiff's Deposition Exhibit 11.**
MS. WILLENSON: Which one is 11?
MS. BECKER: 11 is Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories.
And then Plaintiff's Deposition Exhibit 12 which is titled Plaintiff's Supplemental Answers and Objections to Interrogatories 4 and 16.
BY MS. BECKER:
**Q. You've got both of these documents in front of you?**
A. Yes.
**Q. Okay. Earlier this morning when we started the deposition, I had asked you what you did to prepare for the deposition. And you said you had looked at some documents, and you referenced interrogatories.**
**Are these documents that are Exhibit 11**



**and 12 two of the documents that you looked at in preparation for today's deposition?**
**Go ahead and take your time to look at them.**
A. Yeah. Let me take a second.
These seem familiar to me.
**Q. Did you review them in preparation for your deposition?**
A. Yes.
**Q. Okay. Looking at Plaintiff's Deposition Exhibit 11, going to the last page which is Page 16, about the middle of the page there's a signature line for you. And it says, verified for factual responses only.**
**Do you see that?**
A. Yes, I see that.
**Q. Is that your signature?**
A. That is my signature.
**Q. Okay. And you signed this on or about November 29 of 2021, correct?**
A. I -- yes. That's right.
**Q. And when you signed this document originally, had you reviewed your answers to ensure that they were true and accurate and complete? The**

118

**factual answers?**
A. Yes. That's why I signed it.
**Q. Okay. All right. And you reviewed this in preparation for your deposition today?**
A. I didn't look at it today, no.
**Q. No. I'm sorry.**
**You reviewed this in preparation for your deposition?**
A. Yes.
**Q. When you reviewed this in preparation for your deposition, was there anything in here that appeared to you to be inaccurate?**
MS. WILLENSON: Can you clarify? Do you mean inaccurate at the time he signed it?
MS. BECKER: Well, I'm gonna clarify a little bit differently than that. Let me withdraw the question.
BY MS. BECKER:
**Q. I've also handed you Exhibit 12, correct?**
**And these are supplemental answers to Interrogatories 4 and 16.**
**Turning to Page 4 of Exhibit 12, there is a verification here as well --**
A. Okay.

119

**Q. -- correct?**
**And it indicates that these are true and accurate to the best of your knowledge and belief. And it's your signature below that?**
A. That's my signature.
**Q. Okay. And did you sign this verification on March 21 of 2023?**
A. Yes.
**Q. Okay. And understanding that these are -- this supplement that's 12 provides additional information to Interrogatories 4 and 16 that's not otherwise in 11.**
**Does that make sense?**
A. Could you repeat that?
**Q. Sure.**
**You were supplementing your answers to Interrogatories 4 and 16 because there was additional information to provide, right?**
A. Yes.
**Q. Okay. So did you also review Plaintiff's Exhibit 12 in preparation for the deposition?**
A. I don't remember.
**Q. Okay. We'll do this a different way then.**
**Let's look at -- I'm sorry. Were you**

120

**going to say something?**
A. No.
**Q. Let's look at Plaintiff's Deposition Exhibit 12. Starting with your supplemental answer to Interrogatory Number 4, your answer starts on Page 2.**
A. Okay.
**Q. You had indicated you stopped seeing your -- stopped receiving therapy from Sarah Hurley in February of 2022.**
**Why did you stop seeing Sarah Hurley in February of 2022?**
A. I had been seeing Sarah Hurley since 2013. At some point, you know, we figured out -- I think we've gone as far as we can together. So we had stopped, and then I found a new therapist.
**Q. When you stopped seeing Sarah Hurley, was it your intention to stop therapy altogether?**
A. No.
**Q. You just wanted a new therapist?**
A. Yes.
**Q. Okay. And you started seeing Kelly --**
A. Prendergast.
**Q. Prendergast in June of 2022?**

121

A. Yes.
**Q. So there was a gap in therapy between February of 2022 and June of 2022, correct?**
A. Yes. Correct.
**Q. Okay. Are you still seeing Kelly Prendergast?**
A. Yes.
**Q. How often do you see her currently?**
A. About twice a month, every other week.
**Q. Okay. And when you stopped seeing Sarah Hurley, what frequency were you seeing her?**
MS. WILLENSON: Object to the form.
Go ahead.
THE WITNESS: Once a week, sometimes more.
BY MS. BECKER:
**Q. This also indicates that you stopped seeing for psychiatric treatment Sarah Ritter in January of 2023.**
**Why did you stop seeing Sarah Ritter?**
A. Sarah Ritter left the practice.
**Q. And was Dr. -- is it Gulamali, G-U-L-A-M-A-L-I?**
A. Yes.
**Q. Was -- is that a she?**

A. It's a she.
**Q. Was she part of the same practice that Sarah Ritter had left?**
A. Yes, Blue Sky Telehealth.
**Q. Okay. And are you still seeing her as your psychiatrist?**
A. Yes.
**Q. How often do you see her currently?**
A. Every two or three months.
**Q. So about four, five times a year?**
A. Yeah.
**Q. When you stopped seeing Sarah Ritter, how frequently were you seeing her?**
A. About the same. Unless we change the medication, then it would be a month. But other than that, if I was just staying on the same meds, it would be just every three months.
**Q. When you started seeing Dr. Gulamali, did she change your medication?**
A. I think we kept it mostly the same, if not, changing the times of day that I take it.
**Q. All right. This interrogatory also asks you -- 16, the one below, asks you to identify your social media accounts.**



**And you have identified Facebook, LinkedIn Instagram, Twitter and TikTok as your social media platforms, right?**
A. Yes. I am on these things.
**Q. Do you have any other social media platforms that you're currently on?**
A. I don't think so. These are the ones that I'm on.
**Q. Have you been on any other social media platforms since February of 2019?**
A. Maybe if one new comes out and I try to check it out, but --
**Q. Anything come to mind?**
A. Have you heard of BeReal? Exactly I don't really know it.
**Q. I have because I have a 14-year-old daughter?**
A. Yeah. So I looked at it and then stopped. I don't use it.
**Q. Have you ever posted on any of these platforms about your application with the Chicago Fire Department?**
A. No.
**Q. Have you ever posted on any of these**



**platforms about the Chicago Fire Department's hiring process?**
A. No.
**Q. Have you posted on any of these platforms about the medical clearance process?**
A. No.
**Q. To your knowledge, have you posted anything at all about the Chicago Fire Department on any of these platforms?**
A. I don't think so.
**Q. How about this lawsuit?**
A. Definitely no.
**Q. Okay. Since signing this verification in March of 2013, have you seen any therapist --**
A. 2023?
**Q. Sure, yeah. Sorry.**
**March of 2023, have you seen any therapists other than Kelly Prendergast?**
A. No.
**Q. And since signing this verification in March of 2023, have you seen any psychiatrists other than Dr. Gulamali?**
A. No.
**Q. All right. Let's turn to Plaintiff's**



**Deposition Exhibit Number 12. I'm sorry, 11. You know what, before we get there, I want to ask you -- you've been involved in this lawsuit for a couple years now.**
**Have you personally -- not talking about what your lawyer's done, have you personally interviewed anyone to gather information for your lawsuit?**
A. No.
**Q. Have you been present at any time when your lawyer has interviewed someone to gather information for your lawsuit?**
A. No.
**Q. Okay. Let's turn in Plaintiff's Deposition Exhibit 11 to your answer there to Interrogatory Number 4. The interrogatory starts on Page 4, but your answer is on Page 5 and 6.**
**Starting on Page 5, you there?**
A. I'm there.
**Q. Okay. So you had indicated in this answer that you're currently receiving psychiatric care from Sarah Ritter.**
**But we know that's since changed, correct?**
A. Correct.

**Q. Okay. Prior to Miss Ritter -- well, when did you begin receiving psychiatric care from Miss Ritter?**
A. Somewhere after -- I'm sorry.
Can you repeat the question?
**Q. When did you begin seeking psychiatric care from Miss Ritter? Probably Dr. Ritter.**
A. No. She's --
(Reporter clarification.)
MS. BECKER: She's not a doctor.
THE WITNESS: I can't recall the dates.
BY MS. BECKER:
**Q. Is it sometime after June of 2021?**
A. Yes.
**Q. Do you -- and that's when you stopped seeing Dr. Kushawha?**
A. Kushawha (pronunciation.)
**Q. K-U-S-H-A-W-H-A.**
A. Yes.
**Q. Do you know how much of a gap between seeing that doctor and ending in June of 2021 there was before you started seeing Sarah Ritter?**
A. I can't recall.
**Q. Do you have an approximation?**



A. No.
**Q. Was there a gap in psychiatric treatment?**
A. I'm sure there was. Finding -- finding any sort of healthcare provider in this day in age is very difficult.
**Q. Why is that?**
A. Cause there's a lot of barriers in healthcare.
**Q. Such as?**
A. Well, there's financial, health insurance, finding somebody in your network. You know, that's sort of general stuff.
**Q. Dr. Kushawha, you stopped seeing her in June of 2021. Why?**
**Why did you stop at that point?**
A. All these doctors that I was seeing at Rush are residents, and they would come and go.
**Q. So she was at Rush?**
A. Yes.
**Q. And she left the practice in June of 2021?**
A. I don't -- you know, Rush is so big. So I think she just moved to a different part of the hospital.
**Q. Vanessa Cutler, she was the one who filled**



**out your form from Dr. Wong, correct?**
A. Yeah.
**Q. You saw her from August of 2018 to April of 2019?**
A. Uh-huh.
**Q. Correct?**
A. Correct.
**Q. So not even a year?**
A. Yeah.
**Q. Did she work at Rush?**
A. Yes.
**Q. And why did you stop seeing her in April of 2019?**
A. Because she also moved on.
**Q. And April of 2019 is the fourth month of 2019. And the next doctor you didn't start seeing until the end of 2019.**
**So was there a several-month gap in your psychiatric treatment?**
A. I -- yes. There -- I was given enough medication to hold me over until I was able to see another one of these resident doctors.
**Q. Okay. So there was no change in your medication during that gap in 2019; is that**



**correct?**
MS. WILLENSON: Object to the form.
THE WITNESS: I can't recall.
BY MS. BECKER:
**Q. Okay. Prior to Vanessa Cutler, you saw Tara Thomas from August of 2016 to February of 2017; is that right?**
A. Yes.
**Q. So why did you stop seeing Tara Thomas in February of 2017?**
A. She had also moved on.
**Q. And was she your psychiatrist right before Vanessa Cutler?**
A. Yes.
**Q. So from February of 2017 when you stopped seeing Tara Thomas until August of 2018, were you without a psychiatrist?**
A. Yes.
**Q. What did you do during that period for medication?**
A. I don't recall.
**Q. Do you recall at any point during that period running out of medication?**
A. It was so long ago. I can't remember.

**Q. Prior to Tara Thomas, your psychiatrist was Rosebelle Deleon?**
A. Uh-huh, yes.
**Q. And you saw her from July 2014 to May of 2016, correct?**
A. Correct.
**Q. So why did you stop seeing her in May of 2016?**
A. She was another resident.
**Q. Okay. And then there was a gap -- you tell me.**
**From May of 2016 to August of 2016, did you have a psychiatrist?**
A. No.
**Q. And so did you see anyone during that time for medication management?**
A. Well, typically it's every three months I would follow up with medication. So between May and August of 2016, that was just the timing.
**Q. Okay. And prior to Miss Deleon was Nikita Pant --**
A. Yes.
**Q. -- was your psychiatrist, correct?**
A. Very briefly, yes.



**Q. You only saw her for it looks like less than two months?**
A. Yeah.
**Q. And why did you stop seeing Miss Pant in July of 2014?**
A. I stopped seeing Dr. Pant after she had left as well.
**Q. Your primary care physician is Dr. John?**
A. Yes.
**Q. Are you still -- is he still your primary care physician?**
A. He is, yes.
**Q. And prior to him it was Dr. Ryan, correct?**
A. Correct.
**Q. Okay. Why did you switch from Dr. Ryan to Dr. John?**
A. Dr. Ryan moved to a different part of the hospital.
**Q. And Sarah Hurley was your therapist, I think you said, since 2013, correct?**
A. Correct.
**Q. Prior to Sarah Hurley, had you had any therapist?**
A. No. She was my first one.



**Q. Okay. Plaintiff's Deposition Exhibit 11 I believe you had indicated is one of the documents -- the one we're looking at.**
A. Okay. I'm sorry.
**Q. It was one of the documents you had with you in preparation for your deposition.**
**Other than the supplemental information that you provided in Exhibit 12 that we went through, is there anything about 11 that when you reviewed it to prepare for your deposition that appeared to be incomplete or inaccurate?**
A. This was, to the best of my knowledge, accurate.
**Q. Okay. And it was when you reviewed it in preparation for your deposition?**
A. Yes.
**Q. Okay. Who is Emily Iverson?**
A. An ex-girlfriend.
**Q. When was the last time you spoke to Miss Iverson?**
A. She text me a meme yesterday.
**Q. Okay. Has Miss Iverson worked for the City of Chicago or any of its departments?**
A. If I recall, she's a teacher for --



**Q. Chicago public schools?**
A. CPS, yes.
**Q. What school does she teach at?**
A. I have no idea.
**Q. Do you know if Miss Iverson has ever applied to work at the Chicago Fire Department?**
A. No.
**Q. What knowledge does Miss Iverson have about your lawsuit?**
MS. WILLENSON: Object to foundation.
THE WITNESS: I don't even remember. You know, we're not close anymore. So I couldn't tell you.
BY MS. BECKER:
**Q. When did you break up?**
A. It was very brief, but we stayed friends for a long time. I don't know. I don't know the dates.
**Q. Before or after you didn't pass the medical clearance process?**
A. What is the question?
**Q. Sure.**
A. Sorry.
**Q. Did your relationship -- did your relationship with Miss Iverson end before you were**

**rejected from the medical clearance process in February of 2019?**
A. Yes.
**Q. Do you have any reason to believe that Miss Iverson would have knowledge about the medical clearance process or the allegations in your lawsuit other than what you've told her?**
A. Specifically about my lawsuit?
**Q. Yes.**
A. No.
**Q. Becca -- Rebecca Allpow is your current girlfriend, correct?**
A. Yes. Correct.
**Q. Has she ever worked for the City of Chicago or any of its departments?**
A. No.
**Q. To your -- has she ever applied to work at the Chicago Fire Department?**
A. No.
**Q. Do you have any reason to believe that she has knowledge about the allegations in your lawsuit outside of what you told her?**
A. No.
**Q. Who is Mike Carlson?**



A. He's the drummer in my band.
**Q. Has Mike Carlson ever worked for the City of Chicago or any of its departments?**
A. No.
**Q. To your knowledge, has Mr. Carlson ever applied to work at the Chicago Fire Department?**
A. No.
**Q. To your knowledge, would Mr. Carlson have any information about the allegations in your lawsuit outside of what you've told him?**
MS. WILLENSON: Object to foundation.
THE WITNESS: No.
BY MS. BECKER:
**Q. Secelina (pronunciation) O'Connor, is that your --**
A. Secelia.
**Q. Secelia O'Connor, thank you.**
A. That's my mother.
**Q. That's your mom, okay.**
**Has she ever worked for the City of Chicago or any of its departments?**
A. No.
**Q. Has she ever applied to be a firefighter at this fire department?**



A. No. It's a very funny image, though, thinking about my mom doing that.
**Q. What knowledge does your mom have about the allegations in your lawsuit?**
A. Things that I've shared with her.
**Q. Aside from what you shared with her, do you have any reason to believe she has knowledge about the allegations in your lawsuit?**
A. No.
**Q. Okay. Edward Waller, I understand he's a retired Chicago firefighter, correct?**
A. Correct.
**Q. Do you know when he retired from the fire department?**
A. Not exactly, no.
**Q. Was he a current employee of the fire department when you were rejected from employment in February of 2019?**
MS. WILLENSON: Object to foundation.
BY MS. BECKER:
**Q. If you know.**
A. I am not certain.
**Q. Do you know what rank he retired at within the fire department?**



A. I can't recall.
**Q. And he wrote you a reference letter, right?**
A. That's right.
**Q. Okay. How did you come to know Mr. Waller?**
A. Grew up next door to him.
**Q. Okay. To your knowledge, did Mr. Waller have any role in the application process that you went through for the fire department other than providing a reference letter?**
A. No.
**Q. To your knowledge, did Mr. Waller have any role in the medical clearance process?**
A. No.
**Q. To your knowledge, does Mr. Waller have any information about the allegations in your lawsuit other than what you've told him?**
A. No.
**Q. Have you even discussed your lawsuit with him?**
A. I can't recall exactly what we talked about.
**Q. Have you spoken to Mr. Waller since**

**February of 2019?**
A. Yes. His son is my oldest friend. And maybe the fall of 2021 -- my best friend -- Edward Waller's son had a bachelor party, and he was there.
**Q. And on that occasion did you talk to him about the Chicago Fire Department?**
A. Yes.
**Q. What did you discuss with him?**
A. My general situation. He told me some anecdotes about his time as a firefighter.
**Q. So what did you tell him about your situation?**
A. I told him what happened to me and my feelings about the matter.
**Q. Anything else?**
A. No.
**Q. And what did he share with you about the fire department?**
A. He shared an anecdote with me that he would be on the job working next to guys who were -- these are his words -- on heroin and never got in any sort of trouble. And he thought that my situation was absolutely ridiculous.



**Q. Anything else?**
A. No.
**Q. Is that the only time you've talked to Mr. Waller about your application with the Chicago Fire Department since February of 2019?**
A. As far as I can recall at the moment.
**Q. Do you know if he ever reported these firefighters being on heroin or, as he mentioned, on drugs?**
A. I wouldn't know for certain.
**Q. Okay. You don't know anything about the situation other than what he told you?**
A. Correct.
**Q. And do you have any reason to believe he would have knowledge about your application or medical clearance process outside of what you've told him?**
A. No.
**Q. Nora Sintos is your sister?**
A. Yes.
**Q. Has she ever worked for the City of Chicago or any of its departments?**
A. No.
**Q. Has she ever applied for the Chicago Fire**



**Department?**
A. No.
**Q. Have you talked to Nora Sintos about your allegations in your lawsuit?**
A. Yeah.
**Q. To your knowledge, does she have any information about the allegations in your lawsuit other than what you've told her?**
A. No.
**Q. Delia Starr is your sister as well?**
A. Yes.
**Q. Has she ever worked for the City of Chicago or any of its departments?**
A. No. She never applied to be a firefighter for the City of Chicago.
**Q. Okay. You've talked to her about the allegations in your lawsuit -- in the lawsuit itself?**
A. Yes.
**Q. To your knowledge, does she have any information outside of what you've told her?**
A. No.
**Q. I think we talked previously about Natalie Malinowski. She's your ex-fiancee, correct?**



A. Correct.
**Q. When is the last time you had contact with her?**
A. July 2020.
**Q. Has she ever worked for the City of Chicago?**
A. No.
**Q. Do you know if she's ever applied to work at the fire department?**
A. She has not.
**Q. To your knowledge, would she have any information about the allegations in your lawsuit other than what you've told her?**
A. No.
**Q. Who's Tyler Johnson?**
A. Friend from college.
**Q. Do you keep in touch with him?**
A. Every few months we'll hit each other up through texting or social media, and we sort of commiserate together about life.
**Q. Okay.**
A. And so in this case this was something I vented to him about.
**Q. Has he ever worked for the City of Chicago**

**or any of its departments?**
A. No.
**Q. Has he ever applied to work at the Chicago Fire Department?**
A. No.
**Q. To your -- to your knowledge does he have any information about your lawsuit or the allegations in your lawsuit other than what you've told him?**
A. No.
**Q. Where does Tyler Johnson live?**
A. He's just outside of Peoria.
**Q. Okay.**
A. That's all I know.
**Q. We've talked about Dr. Wong today, and we've talked about Dr. Goldstein.**
**Do you recall the names of any other either fire department or human resources employees that you interacted with during the application or clearance process?**
MS. WILLENSON: Just object to the extent it suggests Dr. Goldstein as a fire department --
MS. BECKER: Of course, yes.
MS. WILLENSON: Yeah.



THE WITNESS: I don't recall.
BY MS. BECKER:
**Q. Okay. Do you know an individual by the name of Barbara Beller?**
A. That name does not sound familiar to me.
**Q. To your knowledge, have you ever communicated with a Barbara Beller?**
A. I can't recall.
**Q. Do you know the name Adrian Bryant?**
A. Does not sound familiar to me, no.
**Q. To your knowledge, did you have any interactions with Miss Bryant during the application or medical clearance process?**
A. I don't recall.
**Q. Elizabeth Crow, have you ever heard that name?**
A. I don't think so.
**Q. To your knowledge, did you have any communications or interactions with Miss Crow during either your application or medical clearance process?**
A. I don't recall.
**Q. Kimberly Fallon, does that name sound familiar?**



A. No.
**Q. Okay. To your knowledge, did you have any communications or interactions with Miss Fallon during the application or medical clearance process?**
A. I can't recall.
**Q. Do you know an individual by the name of Loretta Flores?**
A. No.
**Q. To your knowledge, did you have any interactions with a Loretta Flores in either the application or medical clearance process?**
A. I don't recall.
**Q. Are you familiar with the name of Keyanna Hammond?**
A. That name does sound familiar.
**Q. Okay. Do you recall having any interactions with Miss Hammond during either the application or medical clearance process?**
A. I can't recall.
**Q. You just said the name sounds familiar.**
**What comes to mind?**
A. I just remember hearing about Miss Hammond. She's referred to as Miss Hammond.



I don't know exactly what her role is, but I do recall hearing about her.
**Q. To your knowledge, did you ever meet or talk to Miss Hammond?**
A. I can't recall.
**Q. Do you have any knowledge as to what role she would have had in either the application or the medical clearance process?**
A. I don't recall.
**Q. Are you familiar with an individual by the name of Edgar Ignacio?**
**(Reporter clarification.)**
MS. BECKER: Edgar Ignacio, I-G-N-A-C-I-O.
THE WITNESS: Does not sound familiar.
BY MS. BECKER:
**Q. Do you have any reason to believe you would have interacted with or communicated with an Edgar Ignacio in your application or medical clearance process?**
A. I don't recall.
**Q. Does the name Brian Helmold sound familiar?**
A. No.
**Q. Do you have any reason to believe you**

146

**would have interacted with him during your application or medical clearance process?**
A. I don't recall.
**Q. Are you familiar with the name Monica Porter?**
A. No.
**Q. I think we saw Miss Porter's name earlier today on the letter that sent you to Dr. Goldstein's office.**
**Do you recall having any interactions with Miss Porter either during the application or medical clearance process?**
A. I can't recall.
**Q. Okay. Are you familiar with an individual by the name of Anthony Vasquez?**
A. No.
**Q. Do you have any reason to believe you would have interacted with him during the application or medical clearance process?**
A. I don't recall.
**Q. Are you familiar with an individual by the name of Aaron DeCamp?**
A. No.
**Q. Any reason to think you would have**

147

**interacted with him during the application or medical clearance process?**
A. I'm sorry. I don't recall.
**Q. Are you familiar with an individual named Nicole Patino? Dr. Nicole Patino?**
A. I don't think so. No.
MS. BECKER: Let's take a five-minute break.
MS. WILLENSON: Sure.
(WHEREUPON, a short recess was taken.)
BY MS. BECKER:
**Q. All right. Mr. Sintos, earlier this morning we talked about medications you're currently taking?**
A. Okay.
**Q. Do you remember talking about medications you're currently taking?**
A. Yes.
**Q. Are any of the medications -- do any of the medications that you're currently taking impact your memory, to your knowledge?**
A. I don't know every single side effect of all the medication I've been on, so I couldn't say for certain.

148

**Q. Well -- and I'm not talking about all the medication you've been on. I'm talking about the medication that you're currently prescribed --**
A. Correct.
**Q. -- that you're taking.**
**Remind me what those are. There's --**
A. Gabapentin, Celexa, lamotrigine.
**Q. Those are the three medications you're currently prescribed?**
A. Propanolol.
**Q. Anything else?**
A. As far as from my psychiatrist, that's it.
**Q. Okay. So there's four medications.**
**And the first one you mentioned you take for management?**
A. Yes.
**Q. And how often do you take it?**
A. Every day.
**Q. What dosage?**
A. Oh, I don't remember off the top of my head without looking at the bottle itself.
**Q. Okay. The second one you mentioned was?**
A. Lamotrigine.
**Q. Lamotrigine, do you take that for**

149

**management or as needed?**
A. Management.
**Q. How often do you take it?**
A. Every day.
**Q. Do you know what dosage?**
A. I don't.
**Q. Okay. The third one you mentioned?**
A. Gabapentin.
**Q. Do you take gabapentin for management or as needed?**
A. Management.
**Q. And how often do you take it?**
A. Every day.
**Q. What dosage?**
A. I don't know.
**Q. The last one you mentioned?**
A. Propanolol.
**Q. Do you take that for management or as needed?**
A. As needed.
**Q. When you take it, do you know what dosage you take?**
A. Again, I'd have to look at the bottle.
**Q. How often do you take it?**

A. Not very often. I took it this morning.
**Q. Have you ever been advised that any of those four medications could have the side effect of impacting your memory?**
A. I've never been told that.
**Q. Have you experienced a side effect of having memory loss in taking any of those four medications?**
A. I don't believe so.
**Q. I've asked you a lot of questions this morning.**
**Is there anything as you sit here now that you look back and you answered and you're now saying, oh, gee, that wasn't right; I got something wrong? Anything like that?**
A. I don't know if I said oh, gee, before.
But to answer your question -- and this doesn't have to do with memory loss, but I can't recall for certain.
**Q. Have you understood the questions I've asked you today?**
A. Most of them.
**Q. And to the extent you haven't understood, you've asked me to clarify or repeat them, correct?**



A. Correct.
**Q. Okay. And you've answered the questions that I've asked you today to the best of your ability?**
A. That's correct.
MS. BECKER: Okay. I have no further questions.
MS. WILLENSON: I have a few, a couple.
EXAMINATION
BY MS. WILLENSON:
**Q. Ready, Nick?**
A. I'm ready.
**Q. Okay. Do you recall at the very beginning of the deposition you mentioned as one of the documents you reviewed to prepare, a third amended something?**
A. Yes, but now I know that it's a complaint.
**Q. Okay. So you recall reviewing the third amended complaint?**
A. Yes.
**Q. I'm gonna read you Paragraph 31 from the third amended complaint.**
A. Okay.
**Q. In June 2019, Mr. Sintos finally received a call from Dr. Wong. He told Mr. Sintos that the psychologist from Isaac Ray Forensic Group did not "recommend" him for employment with the Chicago Fire Department.**



**He also told Mr. Sintos something to the effect that he "would not want to put him in a position with a job that causes a lot of stress."**
**Is that a true and accurate statement?**
A. Yes.
**Q. Does that refresh your recollection about an additional remark that Dr. Wong made when he called you in June 2019?**
A. Yes.
**Q. And that would be that he said something to the effect that he would not want to put you in a position with a job that causes a lot of stress?**
A. Yes.
**Q. Could you look at Exhibit 7 to your deposition which is the clearance letter that Dr. Cutler signed?**
**We're going to look at the very last page which is Page 11, Sintos 0034.**
A. Okay.
**Q. Do you see the top, it says, has your patient had any symptoms of depression or bipolar disease in the past 12 months, and it's checked yes?**



A. I see that.
**Q. Okay. And do you recall that Miss Becker clarified -- we all clarified -- or she clarified with you that you do not have bipolar disease and have never had bipolar disease.**
**So that would be a reference to symptoms of depression?**
A. Yes.
**Q. Do you see below that it says, if yes, please describe episodes and provide dates of episodes slash symptoms?**
A. I see this.
**Q. And Dr. Cutler wrote, currently well-treated and in early remission based on compliance with care since September 2018.**
**Do you see that?**
A. I see that, yes.
**Q. And was that an accurate -- is that an accurate statement?**
A. Yes.
**Q. At the time that you saw Dr. Cutler and**

154

**were in the medical clearance process on February 14, 2019, you were well-treated?**
A. Yes.
**Q. And your symptoms were in remission?**
A. Yes.
**Q. And you were compliant with your psychiatric care since September 2018?**
A. Yes.
**Q. And do you see at the very bottom under treating physician's statement there's also a section that says comment or comments?**
A. Yes.
**Q. And Dr. Cutler wrote, patient has been a hundred percent compliant with care.**
**Do you see that?**
A. Yes.
**Q. Was that also accurate?**
A. Yes.
MS. WILLENSON: Those are all my questions.
MS. BECKER: I have a couple follow-up questions from that.
FURTHER EXAMINATION
BY MS. BECKER:
**Q. Mr. Sintos, do you know Dr. Cutler's**

155

**qualifications?**
MS. WILLENSON: Object to the form.
THE WITNESS: She's a doctor.
BY MS. BECKER:
**Q. Do you know what background or qualifications she has in occupational -- what would the word be? Strike that.**
**Do you know what background or qualifications she has in assessing qualifications for firefighters?**
MS. WILLENSON: Object to the form.
THE WITNESS: No. I don't know this information.
BY MS. BECKER:
**Q. Okay. I think you indicated that you took your as-needed medication this morning before this deposition. Why was that?**
MS. WILLENSON: This is outside the scope of my --
MS. BECKER: It's not. If I --
MS. WILLENSON: I believe it is.
MS. BECKER: Okay.
MS. WILLENSON: Go ahead. I'll allow it.
Go ahead.

156

BY MS. BECKER:
**Q. Why is that?**
A. I've never done anything like what we're doing today, so I was feeling nervous.
**Q. Were you feeling stressed?**
A. Of course.
**Q. Does your as-needed anxiety medication help manage your stress?**
A. The as-needed medication propanolol is normally prescribed to people with high blood pressure.
As far as anxiety goes, it helps alleviate the physical symptoms of anxiety, not mental. So it sort of helps me just kind of slow down.
**Q. Okay.**
A. Lower my heart rate.
**Q. Does stress or being in stressful situations manifest any of your symptoms of depression or anxiety?**
MS. WILLENSON: Object to the form, but also I see no connection between this and my questions.
THE WITNESS: Okay. Can you repeat that? I'm sorry.
MS. BECKER: Can you reread it, please?

157

(WHEREUPON, the record was read as requested.)
MS. WILLENSON: Same objection.
THE WITNESS: What would you consider a stressful situation as an example?
BY MS. BECKER:
**Q. Sure.**
**Could responding to a fire or seeing someone who had died in a fire, could that prompt a panic attack or some other type of symptom of anxiety?**
MS. WILLENSON: Objection to form and foundation. We are now light years away from --
MS. BECKER: We might be now.
BY MS. BECKER:
**Q. You can answer the question.**
A. Could or would?
**Q. Could.**
A. I have no idea.
**Q. Because you've never worked at a fire department, right?**
A. I've never worked for a fire department.
MS. BECKER: No further questions.
MS. WILLENSON: We'll reserve.

158

FURTHER DEPONENT SAITH NAUGHT.
(WHEREUPON, the deposition concluded at 12:45 p.m.)

159

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICHOLAS SINTOS, )
Plaintiff, )
vs. ) No. 21 C 5327
CITY OF CHICAGO, )
Defendant. )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Raelene Stamm, Certified Shorthand Reporter, on August 9, 2023, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

_________________________
NICHOLAS SINTOS

SUBSCRIBED AND SWORN TO
before me this ______ day
of __________________, 2023.
___________________________
Notary Public

160

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, RAELENE STAMM, Certified Shorthand Reporter, licensed by the State of Illinois, do hereby certify that heretofore, to-wit, on the 9th day of August, 2023, personally appeared before me NICHOLAS SINTOS, a witness in a certain cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein NICHOLAS SINTOS is the Plaintiff and CITY OF CHICAGO is the Defendant.

I further certify that the said NICHOLAS SINTOS was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of said witness and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was not waived by counsel

161

for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand this 28th day of August, 2023.

______________________________________
CERTIFIED SHORTHAND REPORTER