**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS SINTOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 5327 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, | ) | Mag. Judge Jeffrey T. Gilbert |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CITY OF CHICAGO'S RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

Laner Muchin, Ltd.
Heather Becker and Michael DeMarino
Special Assistant Corporation Counsels
515 North State Street, Suite 2400
Chicago, Illinois 60654
(312) 467-9800 (phone)
hbecker@lanermuchin.com
mdemarino@lanermuchin.com

## TABLE OF CONTENTS


I. FACTS THAT WARRANT THE DENIAL OF SUMMARY JUDGMENT .......... 1

- A. The Medical Clearance Process is Designed to Ensure that Applicants Can Safely and Effectively Perform the Essential Functions of the Job. ........................ 1
- B. Plaintiff's Concentra Examination Led to the Identification of Certain Mental Health Information that Warranted Further Medical Review. .................... 3
- C. Dr. Wong Sought Input from Third Parties Following His Own Examination of Plaintiff. ........................................................................... 4
- D. Dr. Wong Did Not Medically Clear Plaintiff Because He Concluded that Plaintiff Could Not Perform the Essential Functions of the Job. ............................ 6
- E. The Record Contains Sufficient Facts for the City to Present Its Direct Threat Defense to the Jury. ........................................................................ 7
- F. The Record Contains Sufficient Facts for the City to Present Its Failure to Mitigate Defense to the Jury. ..................................................................... 8

II. LEGAL ARGUMENT ........................................................................... 9

- A. Summary Judgment Standard ..................................................................... 9
- B. Summary Judgment is Not Proper on the Causation Element of Plaintiff's ADA Claim. ....................................................................................... 9
- C. The City Should Be Permitted to Submit Its "Direct Threat" Defense to a Jury. ............................................................................................. 12
- D. Plaintiff is Not Entitled to Summary Judgment on Count III of His Third Amended Complaint Because the City Acted Within Its Discretion to Seek Additional Information from Plaintiff. .............................................................. 15
- E. The City Should Be Permitted to Argue to the Jury that Its Medical Assessment of Plaintiff was Job-Related and Consistent with Business Necessity. ......................................................................................... 18
- F. The City Should be Permitted to Submit Its Failure to Mitigate Defense to the Jury. ......................................................................................... 18

III. CONCLUSION ................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662 (7th Cir. 2000) ... 13
*Bragdon v. Abbott*, 524 U.S. 624 (1998) ... 12
*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) ... 13
*Emerson v. N. States Power Co*., 256 F.3d 506 (7th Cir. 2001) ... 15
*Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, 445 Ill. Dec. 342, 166 N.E.3d 772 (2020) ... 12
*Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016 (7th Cir. 2018) ... 9
*Jankowski v. Dean Foods Co.*, 378 F. Supp. 697 (N.D. Ill. 2019) ... 19
*Kasper v. St. Mary of Nazareth Hosp.*, 135 F.3d 1170 (7th Cir. 1998) ... 19
*Kurtzhals v. Cty. of Dunn*, 969 F.3d 725 (7th Cir. 2020) ... 10
*Lorillard Tobacco Co. v. Humboldt Park Citgo, Inc.*, No. 03 C 5334, 2004 U.S. Dist. LEXIS 19294 (N.D. Ill. Sept. 24, 2004) ... 9
*McKinney v. Am. River Transp. Co.*, 954 F. Supp. 2d 799 (S.D. Ill. 2013) ... 9
*Sumler v. University of Colo. Hosp. Auth.*, 16-cv-02557-RM-KLM, 2018 U.S. Dist. LEXIS 178505 (D. Colo. Oct. 17, 2018) ... 17
*Tate v. Dart*, 51 F.4th 789 (7th Cir. 2022) ... 12
*Winsley v. Cook County*, 563 F.3d 598 (7th Cir. 2009) ... 10

## Statutes

42 U.S.C. § 12112(d) ... 15, 16
42 U.S.C. §12112(a) ... 9
42 U.S.C. §12112(d)(3) ... 16
Americans with Disabilities Act ... 9, 10, 11, 16
Illinois Human Rights Act ... 9, 11

## Regulations

EEOC Notice 915.002 ... 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS SINTOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 5327 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, | ) | Mag. Judge Jeffrey T. Gilbert |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CITY OF CHICAGO'S RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

The Chicago Fire Department ("CFD") is one of the largest fire departments in the United States. Given its critical role in promoting fire safety, providing emergency care, and extinguishing fires, CFD must ensure the individuals it hires to perform these dangerous tasks are physically and mentally qualified to do the job. Thus, one essential component of the application process is medical clearance. This case stems from CFD's decision to deny medical clearance to one individual who sought the position of firefighter/EMT. While Plaintiff attempts to narrow the issues for trial that is set to begin on November 6, 2025, as discussed in detail below, genuine issues of material fact exist that warrant the denial of summary judgment.

## I. FACTS THAT WARRANT THE DENIAL OF SUMMARY JUDGMENT

### A. The Medical Clearance Process is Designed to Ensure that Applicants Can Safely and Effectively Perform the Essential Functions of the Job.

Plaintiff Nicholas Sintos ("Plaintiff") sought employment with CFD as a firefighter/EMT. (Doc. #152, Joint Statement of Undisputed Facts ("SOF") at ¶ 3). In the fall of 2018, after receiving a conditional offer of employment, Plaintiff began the medical clearance process. (SOF at ¶ 4).

At the time, CFD's medical clearance process was overseen by its then-Medical Director, Dr. William Wong ("Dr. Wong"). (SOF at ¶ 6). Dr. Wong had an extensive educational and training background necessary to carry out his duties as Medical Director; upon completion of medical school, Dr. Wong completed a three-year residency in internal medicine, and he is Board certified in internal medicine. (SOF at ¶ 7). Dr. Wong completed a two-year fellowship at the University of Illinois at Chicago, received a master's in public health, and worked as an academic intelligence service officer with the Center for Disease Control and Prevention. (*Id.*). Dr. Wong also received wide-ranging and ongoing training in occupational medicine from his residency and through continuing education with the American College of Occupational and Environmental Medicine ("ACOEM"), the Central States Occupational and Environment Medicine Association ("CSOEMA"), and the U.S. military. (*Id.*).

Dr. Wong had the authority to make CFD's medical clearance decisions for firefighter/EMT applicants during the relevant period. (SOF at ¶ 6; SOF, Ex. 13, Deposition of Dr. William Wong ("Wong Dep."), pp. 71:7-10). Dr. Wong's objective in the medical clearance process was to ensure that the applicants he cleared could safely and effectively perform their essential job duties by way of a clinical medical evaluation of each applicant. (SOF, Ex. 13, Wong. Dep., pp. 85:17-86:6).

The medical clearance process for applicants begins with an examination by a third-party provider, who in this case was Concentra Urgent Care ("Concentra"). (SOF at ¶¶ 11, 17; SOF, Ex. 8, Deposition of Anthony Vasquez ("Vasquez Dep."), pp. 17:15-18:12). From there, each medical evaluation diverges based on the medical conditions and issues presented by each applicant. (*Id.*; SOF, Ex. 10, Deposition of Brian Helmold ("Helmond Dep."), pp. 43:4-44:11). For example, an applicant who presents with asthma may be subject to a closer examination of

the applicant's pulmonary system to ensure that the individual can safely perform the essential duties of the job sought. (SOF, Ex. 13, Wong Dep., pp. 108:22-109:14). Individuals who present with mental health conditions, such as Plaintiff, are no different.

Dr. Wong's approach to medical evaluations evolved over his tenure at CFD in an attempt to address the multiple issues that the Medical Division was identifying among applicants and employees, including, for example, mental health cases, suicides, and cases of post-traumatic stress disorder. (SOF, Ex. 13, Wong Dep., pp. 89:22-90:17). One of these changes was the implementation of psychological screenings for certain applicants to give Dr. Wong more data to identify psychological conditions among applicants that would impact their ability to perform the essential functions of the job. (SOF, Ex. 13, Wong Dep., pp. 101:1-102:24).

### B. Plaintiff's Concentra Examination Led to the Identification of Certain Mental Health Information that Warranted Further Medical Review.

Medical examinations at Concentra begin with the applicant completing a Medical History form. (SOF at ¶ 11, Ex. 15, Concentra File, SINTOS.DEF.000188-200; SOF at ¶ 17). Plaintiff did not merely disclose a history of depression and anxiety and, while Plaintiff's paid doctor may now opine that his major depressive disorder condition was "moderate," in completing his Medical History form, Plaintiff disclosed that he "currently" had "depression" and "anxiety," he has suffered from depression since 2013 (approximately 5 years), and he receives treatment from a psychiatrist and a therapist. (SOF ¶ 11, Ex. 15, Concentra File, SINTOS.DEF.000189, 196-198; SOF at ¶¶ 14, 18). He also reported being on "various anti-depressants" for the "last 5 years," and he revealed a "suicide attempt" in 2014 that led to hospitalization. (SOF at ¶ 11, Ex. 15, Concentra File, SINTOS.DEF.000191, 196-198; SOF at ¶¶ 13, 18). The medical doctor who examined Plaintiff at Concentra, Candace Asieda ("Dr.

Asieda"), recommended that CFD "consider psychiatric clearance." (SOF at ¶ 11, Ex. 15, Concentra File, SINTOS 171).

### C. Dr. Wong Sought Input from Third Parties Following His Own Examination of Plaintiff.

On January 25, 2019, Dr. Wong evaluated Plaintiff at the CFD Medical Division. (SOF at ¶¶ 19-20). Regarding Plaintiff's mental health, Dr. Wong performed three different screening tests, which allowed him to conclude that Plaintiff reported at that time "minimal depression" and "low anxiety." (SOF at ¶ 20). While Plaintiff's paid doctor may now attack the value of these tools, these tests were utilized by Dr. Wong to help him evaluate an applicant's mental health when mental health was identified as a specific area that warranted further exploration. (SOF at ¶ 21). Overall, however, Dr. Wong's "biggest concerning issue" was Plaintiff's "recent history of suicidal ideations and suicidal attempt," explaining that a history of suicide attempt is a concerning indicator, behavior of something greater that warrants further evaluation and potentially "disqualifying" in the context of public safety. (SOF, Ex. 13, Wong Dep., 123:16-124:5; SOF at ¶ 41). Other factors Dr. Wong considered included his current depression symptoms exhibited during the screening and Plaintiff's medication use because of the potential sedating effects and effects on cognitive functions. (SOF, Ex. 13, Wong Dep., pp. 128:16-130:3; SOF at ¶ 20).

Dr. Wong believed "[t]here were concerning aspects of [Plaintiff's] psychological symptoms and history that warranted external evaluation." (SOF, Ex. 13, Wong Dep., pp. 115:17-23; 121:11-17). As a result, Dr. Wong requested that Plaintiff, among other things, have his physician complete a questionnaire and provide a copy of clinical progress notes to the Medical Division. (SOF at ¶ 19). To help facilitate the process, Dr. Wong gave Plaintiff a letter identifying nine specific firefighter/EMT job functions and a list of other KSAs (knowledge, skills, abilities,

and other characteristics) of the job, along with a questionnaire to be completed by his treating psychiatrist, Dr. Vanessa Cutler. (SOF at ¶ 22).

Dr. Wong also requested that Plaintiff undergo a psychological evaluation with Dr. Diana Goldstein ("Dr. Goldstein"). (SOF at ¶¶ 23-24). As with the asthma example referenced above, Dr. Wong did not subject all entering applicants for the firefighter/EMT position to this type of further screening; rather, only applicants with certain mental health concerns were asked to undergo this examination. (SOF at ¶ 27).

Based on his own investigation, Dr. Wong concluded prior to sending applicants to Dr. Goldstein that her evaluations were job related and consistent with business necessity by "asking her through questions and discussions the types of evaluations that she did" and understanding that she "did forensic evaluations using her knowledge, training, and experience in evaluating public safety personnel." (SOF, Ex. 13, Wong Dep., p. 181:11-22). While during this litigation, Dr. Goldstein testified that her screenings were not "fitness-for-duty determinations" (SOF at ¶ 29), Dr. Wong firmly believed that the screenings he had asked Dr. Goldstein to perform were a "psychological assessment of a person's fitness," or "assessment of a person's psychological status." (SOF, Ex. 13, Wong Dep. pp. 43:8-45:12; 104:11-24). Further, his purpose in seeking out Dr. Goldstein for input was to provide a more structured, systematic screening of individuals for psychological conditions that might impact their ability to do their job safely and effectively. (SOF, Ex. 13, Wong Dep., pp. 188:10-189:3).

Dr. Wong did not review the questionnaires or evaluation tools that Dr. Goldstein used when CFD applicants, such as Plaintiff, were sent to her office. (SOF, Ex. 13, Wong Dep., pp. 60:6-10). Rather, Dr. Goldstein provided Dr. Wong with verbal feedback and a one-page letter with her summary recommendation of acceptable, acceptable with reservations, or unacceptable.

(SOF at ¶ 33). Dr. Wong believed that an unacceptable recommendation from Dr. Goldstein was her conclusion that Plaintiff did not have the present ability to safely perform the essential job functions. (SOF at ¶ 50).

### D. Dr. Wong Did Not Medically Clear Plaintiff Because He Concluded that Plaintiff Could Not Perform the Essential Functions of the Job.

On February 13, 2019, Dr. Wong spoke by phone with Dr. Goldstein regarding her evaluation of Plaintiff, and Dr. Wong took notes on the call regarding Dr. Goldstein's feedback. (SOF at ¶ 36). Although Dr. Goldstein made an "unacceptable" recommendation regarding Plaintiff to Dr. Wong, according to Dr. Wong, Dr. Goldstein's input merely confirmed and validated Dr. Wong's own concerns that there was a serious mental condition that did not bode well for performing the essential functions of the job. (SOF, Ex. 13, Wong Dep., p. 108:4-21).

In denying Plaintiff medical clearance, Dr. Wong drew his own conclusion that Plaintiff could not perform the essential functions of the firefighter/EMT job. (SOF at ¶ 52). The "reason for disqualification" written in Dr. Wong's notes included "severe anxiety, panic attack," "recent SI [suicidal ideation]," "poor judgment," "still affected by body dysmorphia," and "symptoms of depression." (SOF at ¶ 37). While Plaintiff attempts to downplay these concerns by attacking the detail set forth in Dr. Wong's notes or referring back to what Dr. Goldstein may or may not have reported over the telephone (SOF at ¶¶ 39-46), nevertheless, Dr. Wong exercised his medical judgment in concluding that these medical conditions would render Plaintiff unable to perform emergency response duties in a 24-hour stressful and rapidly changing environment and interact as part of a cohesive team of emergency responders in order to coordinate and execute a plan. (SOF at ¶ 52; SOF, Ex. 13, Wong Dep., pp. 155:3-160:19, 163:13-166:5, 167:6-168:9, 170:5-10, 171:16-20, 173:4-22, 176:2-177:22, 178:20-179:21).

Admittedly, Dr. Wong did not review the input offered by Plaintiff's treating psychiatrist, Dr. Cutler, prior to making his medical clearance decision. (SOF at ¶ 48). However, Dr. Cutler's opinion was of limited value, given that she restricted her opinion to her assessment of Plaintiff on one specific day ("Based on my interview and assessment today, patient is able to fulfill stated criteria for job…"). (SOF at ¶ 22)(emphasis added).

Dr. Wong also concluded that Plaintiff did not meet NFPA criteria; NFPA criteria refers to National Fire Protection Association standard 1582 that sets out occupational medicine criteria for hiring firefighters. (SOF at ¶ 52; SOF, Ex. 13, Wong Dep. p. 154:16-22). Specifically, Dr. Wong disqualified Plaintiff under NFPA 1582, standard 6.23.1, category A, due to Plaintiff's present condition of major depressive disorder linked to Plaintiff's suicidal attempt, ideations, prior panic attacks, and social anxiety. (SOF, Ex. 13, Wong Dep., pp. 209:6-211:16).

**E. The Record Contains Sufficient Facts for the City to Present Its Direct Threat Defense to the Jury.**

Dr. Wong identified grounds for concluding that Plaintiff could not safely and effectively perform the job of firefighter/EMT, and he found the level of risk high enough to disqualify Plaintiff from medical clearance. (SOF at ¶ 54; SOF, Ex. 13, Wong Dep., pp. 193:20-194:2; 195:19-24). More specifically, Dr. Wong determined that Plaintiff posed a risk of harm to himself, other public safety officials, and the public. (SOF at ¶ 57). Dr. Wong testified that the risk "would be more moderate to severe enough that he would be disqualified because in review of [Dr. Wong's] knowledge and experience and training in occupational health and work in public safety as well as in the military medicine, that depression or to the point of suicide ideations, especially not just the idea of thinking about suicide, but actually carrying it out, is a risk." (*Id.*). The harm Plaintiff posed to himself included the possibility that his mental condition could make him incapacitated during an emergency response – "he could die in a fire if in the

middle of an episode." (SOF, Ex. 13, Wong Dep., p. 194:13-19). Further, the harm to others would be present during a firefight because the teams work in a coordinated response and having one member potentially freezing up during an emergency response could jeopardize everyone. (SOF, Ex. 13, Wong Dep., pp. 194:13-195:6). And regarding possible accommodations for Plaintiff to help eliminate the harm, Dr. Wong knew that CFD did not have a light duty category of work for firefighter/EMT candidates that would allow them to work with restrictions. (SOF, Ex. 13, Wong Dep., pp. 146:16-147:8).

### F. The Record Contains Sufficient Facts for the City to Present Its Failure to Mitigate Defense to the Jury.

While Plaintiff has been continuously employed with no gaps in employment as a medical coder since being denied medical clearance, he seeks back pay damages in this case because he makes significantly less money as a medical coder than he could have made as a firefighter/EMT. (SOF at ¶ 69). Despite his purported desire to be a firefighter, the only thing Plaintiff has done to look for work as a firefighter is a Google search, but he does not recall when he first searched for open firefighter positions, how many times he searched, or over what period of time he searched. (SOF, Ex. 1, Plaintiff's Deposition ("Pl. Dep.") at pp. 99:1-100:1). Plaintiff saw job openings at other fire departments, but he did not apply for any of the positions. (SOF at ¶ 72). He noticed that some other fire departments required certain certifications, which deterred him from applying or even gathering information about what it would take to obtain a certification. (SOF at ¶ 72; SOF, Ex. 1, Pl. Dep., pp. 100:2-101:4). Further, Plaintiff limited his cursory search for other firefighter positions to the state of Illinois (SOF at ¶ 72), despite living only thirty minutes from the Indiana/Illinois state line. (SOF, Ex. 1, Pl. Dep., p. 103:20-240). Moreover, Plaintiff did not talk to anyone to learn about job openings, and he did not keep any notes, lists or records of his job search efforts. (SOF at ¶72).

## II. LEGAL ARGUMENT

### A. Summary Judgment Standard

A district court may only grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). "When the party moving for summary judgment also bears the burden of persuasion at trial, that party's initial summary judgment burden is higher." *McKinney v. Am. River Transp. Co.*, 954 F. Supp. 2d 799 (S.D. Ill. 2013). In other words, "[w]hen the party moving for summary judgment also bears the burden of persuasion at trial (*e.g.*, the movant is the plaintiff or the movant is the defendant asserting an affirmative defense), the movant must establish all the essential elements of its claim or defense." *Id.; see also Lorillard Tobacco Co. v. Humboldt Park Citgo, Inc.*, No. 03 C 5334, 2004 U.S. Dist. LEXIS 19294, *7-8 (N.D. Ill. Sept. 24, 2004).

### B. Summary Judgment is Not Proper on the Causation Element of Plaintiff's ADA Claim.

In Counts I and II of Plaintiff's Third Amended Complaint, Plaintiff alleges that the City of Chicago refused to hire him because of his mental health disabilities and/or history of such disabilities in violation of the Americans with Disabilities Act ("ADA") and the Illinois Human Rights Act ("IHRA"). (Doc. #79, Answer to Third Amended Complaint, ¶¶ 60, 64). The ADA prohibits employers from taking adverse employment action because of a disability. 42 U.S.C. §12112(a). To establish a violation, the individual has the burden of proving that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or

without reasonable accommodation; and (3) the employer took an adverse job action against the individual because of his disability. *Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009).

In an effort to narrow the issues for trial, the parties stipulated that Plaintiff meets the ADA's definition of disability. (SOF at ¶ 12, Ex. 18 (Stipulations)). While Plaintiff concedes, as he must in light of the disputed facts, that this claim as a whole is appropriate for the jury to decide, he attempts to remove from the jurors' purview the critical element of causation. (Doc. #151, Plaintiff's Memorandum of Law in Support of Partial Summary Judgment ("Pl. Memo.")., pp. 6-7).

Whether Plaintiff was denied medical clearance "because of a disability" is an issue involving disputed facts that must be left for the jury to decide. While Plaintiff notes that the amendments to the ADA under the ADAAA, which changed the language prohibiting employers from discriminating "because of" a disability to prohibiting employers from discriminating "on the basis of" a disability, may have changed the "but for" causation standard, Plaintiff contends that the Court need not reach that issue because, as a matter of law, "Plaintiff can establish but-for causation on summary judgment." (Pl. Memo., p. 7, n. 3). In a "but-for analysis," if the employer would not have taken the action if not for the disability, the disability is the but-for reason for the action. *Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 729 (7th Cir. 2020).

Here, summary judgment should be denied on the element of causation because a reasonable juror could conclude that Plaintiff would have suffered the same adverse employment action if he were not disabled and everything else remained the same. Importantly, Plaintiff ignores Dr. Wong's testimony that his decision for further evaluation relied heavily on the fact that Plaintiff attempted suicide. In fact, Plaintiff's suicidal ideation and recent suicide attempt were Dr. Wong's "biggest concerning issue," while noting that, in the public safety context, it

could be potentially disqualifying on its own. (SOF, Ex. 13, Wong Dep., 123:16-124:5; SOF at ¶ 41). It may be easy now – more than six years after Dr. Wong's examination of Plaintiff – for Plaintiff's hired doctor to criticize Dr. Wong's exercise of caution, but Dr. Wong knew that his decisions had life or death consequences, and he was not prepared to assume the risk that Plaintiff presented. Other factors that lie separate and apart from any label of "disability" include the symptoms Dr. Wong observed during his screening of Plaintiff and Plaintiff's medication usage, including the potential side effects of that medication. (SOF, Ex. 13, Wong Dep., pp. 128:16-130:3; SOF at ¶ 20).

Further, contrary to Plaintiff's suggestion, Dr. Wong did not blindly rely upon Dr. Goldstein's input in making his medical clearance decision. (Pl. Resp., p. 8). Dr. Wong drew his own conclusion that Plaintiff could not perform the essential functions of the firefighter/EMT job, and he also consulted the NFPA standards, which set out the occupational medicine hiring criteria for firefighters. (SOF at ¶ 52). Dr. Goldstein's input merely confirmed and validated Dr. Wong's own concerns regarding Plaintiff's ability to perform the essential functions of the job. (SOF, Ex. 13, Wong Dep., p. 108:4-21).

To say that Dr. Wong's denial of medical clearance was "because of his disability" as a matter of law dramatically oversimplifies and discounts the considerations that went into the decision. Reasonable jurors could conclude that Dr. Wong had legitimate grounds for seeking further screening and then subsequently denying medical clearance that were removed from the mere label of the term "disability," and the City should not be denied that opportunity at a trial that is already scheduled to proceed.

Finally, because Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework, summary judgment on the causation

element should similarly be denied under Count II of the Third Amended Complaint. *See Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022); *Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, 445 Ill. Dec. 342, 166 N.E.3d 772, 783-88 (2020).

### C. The City Should Be Permitted to Submit Its "Direct Threat" Defense to a Jury.

Plaintiff seeks to bar the City from asserting a "direct threat" defense at trial. (Pl. Resp., pp. 9-12). This affirmative defense would require the City to demonstrate that both the risk of danger and the potential for harm are significant. *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998). In this regard, the jury should be allowed to hear the differing medical opinions in this case. On the one hand, there is Plaintiff's hired doctor who several years after the fact opines that Plaintiff mental health presented no elevated safety risk. (SOF ¶ 61). The City does not dispute that that is the opinion he offered, but it is just that, an opinion. On the other hand, the jury should be permitted to hear the testimony of the medical doctor who actually examined Plaintiff and was in the position to make an assessment at the time.

Dr. Wong made clear at his deposition that he concluded Plaintiff posed a risk of harm to himself, other public safety officials, and the public. (SOF at ¶ 57). Dr. Wong testified that the risk "would be more moderate to severe enough that he would be disqualified because in review of [Dr. Wong's] knowledge and experience and training in occupational health and work in public safety as well as in the military medicine, that depression or to the point of suicide ideations, especially not just the idea of thinking about suicide, but actually carrying it out, is a risk." (*Id.*). Dr. Wong further made clear that the harm Plaintiff posed to himself included the possibility that his mental condition could make him incapacitated during an emergency response – "he could die in a fire if in the middle of an episode." (SOF, Ex. 13, Wong Dep., p. 194:13-19). Further, the harm to others would be present during a firefight because the teams work in a

coordinated response and having one member potentially freezing up during an emergency response could jeopardize everyone. (SOF, Ex. 13, Wong Dep., pp. 194:13-195:6).

Plaintiff attacks the speculative nature of Dr. Wong's assessment and testimony because no one can say with certainty what would or would not have happened had Dr. Wong medically cleared Plaintiff (Pl. Resp., pp. 10-12), but an employer does not have to wait until there has been a serious accident before it can take action. *See, e.g., Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 671-72 (7th Cir. 2000) (doctor suspected of drinking on the job was direct threat even though he had not yet injured anyone).

Further, Plaintiff argues that Dr. Wong could not have made a "direct threat assessment" because he testified at his deposition that he did not know what the term "direct threat assessment" was. (Pl. Resp., p. 10). This argument is misleading. Regardless of the terminology used under the ADA, Dr. Wong, a non-lawyer, certainly assessed the risk level Plaintiff presented when he had to decide whether to medically clear Plaintiff or not. (SOF at ¶ 57).

Plaintiff also argues that the City should be foreclosed from asserting the direct threat defense because Dr. Wong did not consider accommodations. (Pl. Resp., p. 11). This argument ignores Dr. Wong's testimony, however, that there were no accommodations that he could offer because light duty is not the type of situation that could be provided to a firefighter/EMT. (SOF, Ex. 13, Wong Dep., pp. 146:16-147:8). In other words, it is not that Dr. Wong did not consider accommodations, but, rather, he knew there was nothing to consider because accommodations could not be made for this position. (*Id.*). *Cf. EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (noting that there is no failure to accommodate claim based on a breakdown in the interactive process if the employer can show that no reasonable accommodation was possible).

Moreover, Plaintiff argues that Dr. Wong did not use his "best available objective evidence" because he did not wait to receive Dr. Cutler's assessment before making a decision, and Plaintiff attacks Dr. Wong's qualifications to make these decisions. (Pl. Resp., p. 11). Both arguments are red herrings. Dr. Cutler – Plaintiff's treating doctor who has taken an oath to do no harm to her patients – is far from objective; she had a vested interest in ensuring that she did not damage Plaintiff's chances of employment. Further, her assessment ended up being of limited value, because she restricted her assessment to one isolated day ("Based on my interview and assessment today, patient is able to fulfill stated criteria for job…"). (SOF at ¶ 22)(emphasis added).

And as for Dr. Wong's qualifications to make these types of medical clearance decisions, stating that Dr. Wong "did not feel qualified" flies in the face of Dr. Wong's extensive education and training in the area of occupational medicine (SOF ¶ 7). It further distorts the testimony elicited in this case, including Dr. Wong's explanation for seeking third party input:

> Q: And why couldn't you evaluate those?
>
> A: Because I recognized the severity of the – the importance of the medical clearance decision and I – it warranted external third-party review in addition to what I had gathered internally.

(SOF, Ex. 13, Wong Dep. at 101:12-16). This third-party review came after Dr. Wong had already been evaluating these cases on his own from 2014 through 2017, and he was attempting to address the multiple issues that the Medical Division was identifying among applicants and employees, including, for example, mental health cases, suicides, and cases of post-traumatic stress disorder. (SOF, Ex. 13, Wong Dep., pp. 89:22-90:17). The fact that Dr. Wong changed his approach to address real problems he was seeing should not lead to an attack on his qualifications but, rather, an acknowledgement that these issues were complex and needed to be treated as such.

Finally, Plaintiff concedes that the second element of his disability discrimination claim – whether he was otherwise qualified to perform the essential functions of the job with or without accommodations – is an appropriate issue for the jury. (Pl. Resp., p. 7). This is a case where the direct threat defense goes hand in hand with this required element. For example, in *Emerson v. N. States Power Co*., 256 F.3d 506, 514 (7th Cir. 2001), the Seventh Circuit stated that "an employee is not a qualified individual" if he poses a direct threat. 256 F.3d at 513-14. In *Emerson*, the plaintiff was terminated from a job where she primarily handled routine calls from customers, but five percent to ten percent of the job consisted of processing calls about gas and electrical emergencies. *Id.* The plaintiff suffered from an anxiety disorder and the defendant submitted unchallenged evidence showing that she required "unpredictable breaks of indeterminate time to recover from a condition she exhibited at work previously." *Id.* at 514. The Seventh Circuit held that she posed a direct threat, noting that the plaintiff worked at a job, which by its very nature could be stressful, and required "prompt, accurate handling of emergencies," and further noting that the plaintiff had already had two panic attacks at work. *Id.*

Here, too, a jury may find that Plaintiff could not perform the essential functions of the job if he posed a direct threat to himself, his colleagues, and the public. Yet, not allowing both of these issues to go to a jury may deprive the City of this argument.

For all of these reasons, the jury should be able to determine whether Plaintiff presented a direct threat.

### D. Plaintiff is Not Entitled to Summary Judgment on Count III of His Third Amended Complaint Because the City Acted Within Its Discretion to Seek Additional Information from Plaintiff.

Plaintiff argues that it is entitled to summary judgment under 42 U.S.C. § 12112(d) by requiring Plaintiff to undergo an additional screening examination with Dr. Goldstein. (Pl. Resp., pp. 13-18). The ADA specifically addresses the medical examinations and inquiries that may be

made by a prospective employer. 42 U.S.C. § 12112(d). After a job offer is made, a covered employer may require the job applicant to undergo a medical examination if all entering employees are subjected to such an examination regardless of disability. 42 U.S.C. §12112(d)(3). Further, after an employer has obtained basic medical information from all individuals who have been given conditional offers, if may require that specific individuals participate in follow-up examinations or provide more medical information so long as the request for additional information is medically related to the previously obtained medical information. *See* EEOC Notice 915.002, Enforcement Guidance: Pre-employment Disability-Related Questions and Medical Examinations.

Here, all applicants completed the same questionnaire and were subjected to an examination by Concentra. (SOF at ¶¶ 11, 17; SOF, Ex. 8, Vasquez Dep., pp. 17:15-18:12; SOF, Ex. 10, Helmond Dep., pp. 43:4-44:11). Only then, based on the medical information provided and/or assessments of Concentra and Dr. Wong were certain individuals, such as Plaintiff, referred for further examination, which is consistent with the ADA. (*Id.*). In fact, in this case, Plaintiff disclosed that he "currently" had "depression" and "anxiety," he has suffered from depression since 2013 (approximately 5 years), and he receives treatment from a psychiatrist and a therapist. (SOF ¶11, Ex. 15, Concentra File, SINTOS.DEF.000189, 196-198; SOF at ¶¶ 14, 18). He also reported being on "various anti-depressants" for the "last 5 years," and he revealed a "suicide attempt" in 2014 that led to hospitalization. (SOF at ¶ 11, Ex. 15, Concentra File, SINTOS.DEF.000191, 196-198; SOF at ¶¶ 13, 18). The medical doctor who examined Plaintiff at Concentra, Candace Asieda ("Dr. Asieda"), recommended that CFD "consider psychiatric clearance." (SOF at ¶ 11, Ex. 15, Concentra File, SINTOS 171). And consistent with that recommendation, Dr. Wong sought additional third-party input.

As Plaintiff notes, the additional follow up must assess whether the applicant's medical condition will impair their ability to perform the essential functions of the job or pose a direct threat. (Pl. Resp., p. 14). Here is where the fact dispute lies; while Dr. Goldstein contends that her screening did not determine whether Plaintiff could do the job (despite the "acceptable," "acceptable with reservations," and "unacceptable" conclusions she drew), Dr. Wong very much believed that the feedback he received provided him the confirming information he needed to make that assessment. In fact, prior to sending any applicants to Dr. Goldstein, Dr. Wong confirmed that her evaluations were job related and consistent with business necessity by "asking her through questions and discussions the types of evaluations that she did" and understanding that she "did forensic evaluations using her knowledge, training, and experience in evaluating public safety personnel." (SOF, Ex. 13, Wong Dep., p. 181:11-22). Dr. Wong will testify that the screenings he had asked Dr. Goldstein to perform were a "psychological assessment of a person's fitness," or "assessment of a person's psychological status." (SOF, Ex. 13, Wong Dep. pp. 43:8-45:12; 104:11-24). And he believed that an unacceptable recommendation from Dr. Goldstein was her conclusion that Plaintiff did not have the present ability to safely perform the essential job functions. (SOF at ¶ 50). According to Dr. Wong, Dr. Goldstein's input merely confirmed and validated Dr. Wong's own concerns that Plaintiff had a serious mental condition that did not bode well for performing the essential functions of the job. (SOF, Ex. 13, Wong Dep., p. 108:4-21). *See also Sumler v. University of Colo. Hosp. Auth.*, 16-cv-02557-RM-KLM, 2018 U.S. Dist. LEXIS 178505, *16-24 (D. Colo. Oct. 17, 2018) (granting summary judgment for employer because all candidates completed the same questionnaire and the triggering criteria for the plaintiff to be subject to additional review was job-related and consistent with business necessity).

For all of these reasons, Plaintiff's motion for summary judgment as to Count III of its Third Amended Complaint should be denied as there are disputed facts that must be determined by a jury.

**E. The City Should Be Permitted to Argue to the Jury that Its Medical Assessment of Plaintiff was Job-Related and Consistent with Business Necessity.**

Plaintiff seeks to strike the City's affirmative defense related to the question of whether Dr. Goldstein's screening was job-related and consistent with business necessity. (Pl. Resp., p. 18). Consistent with the City's argument in Section II.D. above, incorporated herein by reference, there are disputed facts on this issue because Dr. Wong concluded that the screening was job-related and consistent with business necessity. He concluded this by "asking her through questions and discussions the types of evaluations that she did" and understanding that she "did forensic evaluations using her knowledge, training, and experience in evaluating public safety personnel." (SOF, Ex. 13, Wong Dep., p. 181:11-22). Thus, Plaintiff's motion seeking to strike this affirmative defense should be denied because there are genuine issues of fact that preclude summary judgment.

**F. The City Should be Permitted to Submit Its Failure to Mitigate Defense to the Jury.**

A jury should be permitted to hear and decide the City's failure to mitigate defense so that it can be factor into its decision on damages, should the jury need to consider damages. Simply put, while continuously employed as a medical coder, Plaintiff made little to no effort to attempt to reduce his back pay damages by way of other employment. Plaintiff should not be permitted to seek a windfall from the City by way of damages when he performed nothing more than a Google search on firefighter jobs that was so cursory that he could not recall when he first searched for open firefighter positions, how many times he searched, or over what period of time

he searched. (SOF, Ex. 1, Pl. Dep., pp. 99:1-100:1). Further, while he acknowledged seeing job openings at other fire departments – evidence that comparable jobs did in fact exist – he did not bother to apply for any of the positions or seek any information about the positions. (SOF at ¶ 72; SOF, Ex. 1, Pl. Dep., pp. 100:2-101:4). A jury should further be able to consider the fact that Plaintiff was not open to seeking jobs a mere thirty minutes down the road from his house, nor did he make any effort to network to learn about job openings or keep track of his mitigation efforts. (SOF at ¶72). *See Jankowski v. Dean Foods Co.*, 378 F. Supp. 697, 713 (N.D. Ill. 2019) (holding that jury should be permitted to consider the plaintiff's failure to mitigate when there is evidence indicating that the plaintiff did not seek employment for a period after his separation, and finding that the jury must determine whether his subsequent efforts constituted reasonable diligence to mitigate his damages); *see also Kasper v. St. Mary of Nazareth Hosp.*, 135 F.3d 1170, 1176 (7th Cir. 1998) (holding that it "was for the jury to decide" whether the plaintiff's mitigation efforts were sufficient).

## III. CONCLUSION

For all of the reasons set forth herein, Plaintiff's Partial Motion for Summary Judgment should be denied in its entirety,

Date: March 6, 2025

Respectfully submitted,

By: /s/ Heather Becker
Special Assistant Corporation Counsel

Laner Muchin, Ltd.
Heather Becker and Michael DeMarino
Special Assistant Corporation Counsels
515 North State Street, Suite 2400
Chicago, Illinois 60654
(312) 467-9800 (phone)
hbecker@lanermuchin.com
mdemarino@lanermuchin.com

## CERTIFICATE OF SERVICE

Heather Becker, an attorney, certifies that she caused the foregoing **Defendant City of Chicago's Response to Plaintiff's Partial Motion for Summary Judgment** to be served on all counsel of record via the Court's ECF filing system on this 6th day of March, 2025.

/s/ *Heather Becker*